

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-27-2007

# USA v. Ali

Precedential or Non-Precedential: Precedential

Docket No. 05-2098

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Ali" (2007). *2007 Decisions.* Paper 154.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/154

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-2098

UNITED STATES OF AMERICA,

Appellant

v.

FARIDAH ALI
a/k/a RITA SPICER

No. 05-2099

UNITED STATES OF AMERICA,

Appellant

v.

LAKIHA SPICER
a/k/a KIKI

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 04-cr-00320-2/3)
District Judge: Honorable John P. Fullam


Argued January 16, 2007

Before: McKEE, AMBRO and STAPLETON, <u>Circuit Judges</u>

(Filed: November 27, 2007)

Patrick L. Meehan
    United States Attorney
Robert A. Zauzmer
    Assistant United States Attorney
    Chief of Appeals
Anthony J. Wzorek (Argued)
    Assistant United States Attorney
Frank A. Labor, III
    Assistant United States Attorney
Office of the United States Attorney
615 Chestnut Street
Philadelphia, PA   19106

        Counsel for Appellant

2

Joel I. Fishbein, Esquire (Argued)
Gail Z. Weilheimer, Esquire
Frank, Rosen, Snyder & Moss
8380 Old York Road, Suite 410
Elkins Park, PA   19027

Alan L. Frank, Esq.
Alan L. Frank Law Associates
8380 Old York Road
Suite 410
Elkins Park, PA.  19027

      Counsel for Appellee

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

The Government appeals the sentencing calculations and downward departures from the Sentencing Guidelines ranges for defendants found guilty of fraud.  A criminal jury convicted Faridah Ali (also known as Rita Spicer) and her daughter Lakiha Spicer (together, "defendants") for using a school to obtain federal funds for classes that were never conducted.  At sentencing, the District Court applied a reasonable-doubt standard to determine loss amounts far below the ones the Government had urged under a preponderance-of-the-evidence

3

standard. The Court then looked to good works and community support along with other factors to depart downward from the suggested Guidelines ranges. Defendants received no prison time. Instead, the Court sentenced each defendant to some term of probation with periods of in-home confinement and restitution payments in line with its determination of the loss amounts.

The issues presented to us are whether the Court erred in its initial Guidelines calculations, whether it relied on inappropriate factors for its downward departures, and whether the resulting sentences were unreasonable. We conclude yes for all three issues and remand for further proceedings.

## II.     Factual and Procedural Background

The Community College of Philadelphia (the "College" or "CCP") is a state-accredited public college that obtained a federal grant from the U.S. Department of Education to provide adult basic education ("ABE") classes. In addition to on-site classes, the terms of the grant required the College to conduct classes at approved neighborhood sites in Philadelphia. Under the arrangement, CCP paid $450 per month in rent for these sites plus salaries for qualified teachers (*i.e.*, those who had completed at least a bachelor's degree). One of the approved ABE sites was the Sister Clara Muhammad School ("the School") in West Philadelphia, a private K–12 school.

Between 1999 and 2001, this program was a façade. The School and CCP personnel maintained all the trappings of a functioning program—hiring and paying teachers, establishing a course schedule, filing registration forms, and causing CCP to pay rent to the School for the classrooms. But no courses were taught. Rather, Faridah Ali, assistant director of education at the School, and Delores Weaver, director of the ABE program at CCP, led a fraudulent scheme to steal the money allocated to the program. Specifically, they submitted false student registration forms to CCP, thereby ensuring that it would make salary and rent payments to the School for a certain number of classes. Ali and Weaver divided the rent payments between themselves and arranged for salaries to go to "ghost teachers," many of them unqualified, for courses that never took place. Ali's children, Lakiha and Azheem Spicer, and Weaver's son, Eugene Weaver III, were some of the ghost teachers who received money through this scheme.

In 2004, Ali and the Spicers (Lakiha and Azheem) were tried and convicted on several counts of fraud by a federal jury in the United States District Court for the Eastern District of Pennsylvania.[1] The grand jury indictment specified that Ali and

---

[1] Ali was convicted on 23 counts of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371, mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, conspiracy to commit theft concerning programs receiving federal funds in violation of 18 U.S.C. § 371, and

aiding and abetting theft concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A) and (b). Lakiha Spicer was convicted on seven counts of the same offenses, plus one count of making a false statement (*i.e.*, perjury) to a federal grand jury in violation of 18 U.S.C. § 1623.

As for the other co-defendants in this case, Azheem Spicer was convicted on five counts of similar offenses and received a sentence of four years' probation with in-home confinement for the first six months, $15,000 in restitution payments, and a special assessment of $500. The Government does not appeal his sentence. Eugene Weaver, who similarly was convicted on several counts of fraud, appealed his conviction although he admitted to receiving $47,000 from CCP without teaching any courses. We affirmed his conviction. *United States v. Eugene Weaver*, 220 F. App'x. 88 (3d Cir. 2007) (not precedential). Delores Weaver's trial was severed due to a pretrial evidentiary dispute and was recently remanded to the District Court. *United States v. Delores Weaver*, No. 04-3888 (3d Cir. Nov. 7, 2007).

In related proceedings, Faridah Ali and her husband Shamsud-din Ali, along with four other defendants, were also charged with and convicted under the Racketeer Influenced and Corrupt Organizations (RICO) Act of a conspiracy involving other fraudulent schemes. As the ringleaders of the RICO conspiracy, Faridah Ali was sentenced to 24 months' imprisonment, three years' supervised release, restitution payments of $21,600, and a special assessment of $2,400, *see United States v. Faridah Ali*, No. 2:04-cr-00611 (E.D. Pa. Feb. 23, 2006), and Shamsud-din Ali was sentenced to 87 months'

6

Weaver had fraudulently obtained over $200,000, and Lakiha Spicer $71,000, but the verdict slip did not designate loss amounts. Those amounts were to be determined at sentencing.[2]

Between the jury verdict and the time of sentencing in 2005, the Supreme Court issued *United States v. Booker*, 543 U.S. 220 (2005), making "sweeping changes" to federal sentencing. *United States v. Davis*, 407 F.3d 162, 163 (3d Cir. 2005). *Booker* "sever[ed] and excis[ed]" the portions of the United States Code that made the United States Sentencing Guidelines mandatory on sentencing and appellate courts. 543

---

imprisonment, five years' supervised release, restitution payments of $365,440.34, and a $2,600 special assessment, *see United States v. Shamsud-din Ali*, No. 2:04-cr-00611 (E.D. Pa. Sept. 21, 2005).

[2] At the end of trial, the Judge asked the parties if they could agree on a loss amount. They could not. Absent a stipulation, the Judge believed that *Blakely v. Washington*, 542 U.S. 296 (2004), required that the loss amount be determined by a reasonable-doubt standard. He proposed two alternate ways of proceeding: 1) the Court could schedule additional arguments and submit the question of the loss amount to the jury to determine, or 2) the parties "could agree that the sentencing judge [would] decide [the loss amount] on the basis of beyond a reasonable doubt and without bothering the jury." App. at 1589–90 (Trial Tr.). The Government requested the former proposal, but the Judge opted for the latter.

U.S. at 245, 258–65; *see also* 18 U.S.C. §§ 3553(b)(1), 3742(e). It then set a "reasonableness" standard of appellate review to this now-advisory Guidelines scheme. 543 U.S. at 261. *Booker* did not, however, decide the required standard of proof for finding facts relevant to sentencing. *See United States v. Grier*, 475 F.3d 556, 561 (3d Cir. 2007) (*en banc*).

At sentencing, the Judge stated his view that the loss amounts should be calculated by evidence proved beyond a reasonable doubt. The Government argued that *Booker* required only proof by a preponderance of the evidence. However, the Judge maintained his view, stating:

> The question then becomes, under the—in calculating the guideline range, what was the amount of money that is properly chargeable as having been obtained by fraud. I persist in the view that this is a finding—since it affects the guideline[s] calculation in an upward way, that this is a—an issue which should be resolved by — insofar as applying—calculating the [G]uideline[s] range is concerned, it has to be found beyond a reasonable doubt. . . . I confess to

8

considerable doubt as to exactly
what the amount of loss was in
each case.

App. at 160.

As noted below in more detail, the Judge determined that
the Presentence Report ("PSR") likely had overstated the
amount of funds fraudulently obtained. For Ali he calculated
the Guidelines sentencing range according to his determination
of the loss amount proved beyond a reasonable doubt, and for
Spicer based on the perjury conviction.[3] He further departed
downward from those advisory ranges based on four factors: (1)
records of public service and community support for both
defendants, (2) the lack of an initial intent to defraud for both,
(3) the minor role played by Lakiha Spicer, and (4) the
"exculpatory no" doctrine in Lakiha Spicer's case.[4] He
sentenced Ali to five years' probation with in-home confinement

---

[3] The Judge stated that he had applied this standard in
entering the final sentence, though he stated no specific
determination of loss amount. *See infra* notes 10–11 and
accompanying text.

[4] This judicially created doctrine provides an affirmative
defense to perjury "if the statements at issue amount to no more
than a denial of criminal conduct in response to investigatory
questioning by the government." *United States v. Barr*, 963
F.2d 641, 645 (3d Cir. 1992); *see infra* Part IV.B.2.d.

9

for the first year, restitution payments of $30,000, and a special assessment of $2,500. He sentenced Spicer to four years' probation with in-home confinement for the first six months, restitution payments of $25,000, and a special assessment of $800.

In appealing these sentences, the Government contends that the District Court erred by applying a reasonable-doubt standard to determine the loss amounts for both defendants, resulting in erroneous Guidelines calculations. It also argues that the Court relied on impermissible factors to depart downward for both defendants. In this context, the Government maintains the final sentences were unreasonable.[5]

## III.    Standard of Review

We review sentences for reasonableness. *Booker*, 543 U.S. at 261; *see also Grier*, 475 F.3d at 561. *Booker* "attempt[ed] [no] elaborate discussion of [the reasonableness] standard," *Cunningham v. California*, 549 U.S. __, 127 S. Ct. 856, 867 (2007), but the Supreme Court recently clarified its meaning. Reasonableness review "merely asks whether the trial court abused its discretion" in calculating and applying the

---

[5] The District Court had subject matter jurisdiction over this case pursuant to 18 U.S.C. § 3231. We have jurisdiction over the Government's appeal under 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291.

Guidelines. *Rita v. United States*, 551 U.S. __, 127 S. Ct. 2456, 2465 (2007); *see also id.* at __, 127 S. Ct. at 2470 (Stevens, J., concurring) ("Simply stated, *Booker* replaced the *de novo* standard of review required by 18 U.S.C. § 3742(e) with an abuse-of-discretion standard that we called 'reasonableness' review.").

*Rita*, which allowed appellate courts to apply a non-binding presumption of reasonableness to within-Guidelines sentences, did not set standards governing below-Guidelines range sentences like those before us. *See id.* at __, 127 S. Ct. at 2462.[6] However, it did note that the reasonableness presumption applies only to within-Guidelines sentences without suggesting an unreasonableness presumption to outside-of-Guidelines sentences. *Id.* at __, 127 S. Ct. at 2467. It also emphasized that the reasonableness presumption applies to appellate review only; it does not affect the ordinary sentencing process that a district court judge must undertake. *Id.* at __, 127 S. Ct. at 2465.

We have interpreted *Booker* to require the following three steps in the ordinary sentencing process:

> (1) Courts must continue to calculate a defendant's Guidelines

---

[6] The Supreme Court is considering that question this Term in *Gall v. United States*, No. 06-7949, 127 S. Ct. 2933 (2007).

11

sentence precisely as they would have before *Booker*.

(2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.

(3) Finally, they are required to exercise their discretion by considering the relevant [18 U.S.C.] § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (internal citations, brackets, and quotation marks omitted); *see also United States v. King*, 454 F.3d 187, 196 (3d Cir. 2006); *United States v. Cooper*, 437 F.3d 324, 330 (3d Cir. 2006).

## IV.    Discussion

12

### A.      Step One:  Guidelines Calculation

### 1.      Initial Calculation

As we have noted repeatedly, sentencing "[c]ourts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*."  *Gunter*, 462 F.3d at 247 (citing *King*, 454 F.3d at 196; *Cooper*, 437 F.3d at 330); *see also Grier*, 475 F.3d at 564 ("District courts must still conduct the full Guidelines analysis in every case.").  Nothing in *Rita* changed this requirement.  To the contrary, *Rita* affirmed our approach, emphasizing that the sentencing "process[] will normally begin by considering the presentence report and its interpretation of the Guidelines."  551 U.S. at __, 127 S. Ct. at 2465.

In calculating the Guidelines sentence, we have explained that, "[a]s before *Booker*, the standard of proof under the guidelines for sentencing facts continues to be preponderance of the evidence."  *Cooper*, 437 F.3d at 330.[7]  We have further

---

[7] The proper standard for finding facts relevant to sentences has been much contested since the Sentencing Reform Act of 1984, culminating in the *Apprendi* line of cases leading up to *Booker*.  *See Blakely*, 542 U.S. at 296; *Ring v. Arizona*, 536 U.S. 584 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *see also infra* note 14.  This issue was central in *Grier*, which assessed the effect of *Booker* on sentencing requirements and

determined that our "Court will continue to review factual findings relevant to the Guidelines for clear error and to exercise plenary review over a district court's interpretation of the Guidelines." *Grier*, 475 F.3d at 570; *United States v. Fred Cooper*, 394 F.3d 172, 176 (3d Cir. 2005).[8]  "A finding is

---

held that preponderance is the appropriate standard for sentencing calculations. *Grier* recognized that § 3553(a) makes no mention of a burden of proof, and U.S.S.G. § 6A1.3(a) provides only that a court "may consider information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." *Grier*, 475 F.3d at 567 n.7.  However, as the *Grier* majority also stated, "[t]he commentary that accompanies § 6A1.3 reads: 'The Commission believes that use of a preponderance of evidence standard is appropriate . . . .'" *Id.* (quoting U.S.S.G. § 6A1.3 cmt.). *Id.*  It concluded on that basis that a reasonable doubt requirement would be contrary to congressional intent. *Id. But see id.* at 592–95 (Sloviter, J., dissenting) (noting that, like the Sentencing Commission, the Supreme Court has discussed the appropriateness of a preponderance standard at sentencing without holding that it was a requirement).

[8] Subsection (e) of 18 U.S.C. § 3742, which *Booker* excised, imposed a "clearly erroneous" standard of review for factual findings under a mandatory Guidelines scheme. *See* 543 U.S. at 259.  In *Grier* we concluded that *Booker*'s excision of the review-standard was a collateral result of the actions taken to remedy § 3742(e)'s "impermissible references to a mandatory

14

clearly erroneous when although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (internal quotation marks and brackets omitted). When a sentencing court clearly errs in making factual findings, the resulting sentence "will generally be deemed 'unreasonable' and, subject to the doctrines of plain and harmless error, will result in remand to the district court for resentencing." *Grier*, 475 F.3d at 570; *see also Booker*, 543 U.S. at 268; *United States v. Miller*, 417 F.3d 358, 362 (3d Cir. 2005) ("This court has taken the position that *Booker* sentencing issues raised on direct appeal are best determined by the district courts in the first instance.").[9]

---

Guidelines scheme," but that the clearly erroneous standard is still proper because it "fills in the gap for review of particular factual determinations." *Grier*, 475 F.3d at 569 (citing unanimous agreement among the other ten Courts of Appeals to have addressed this issue).

[9] As a preliminary matter, defendants argue that the Government has waived its ability to appeal the sentencing determination because it failed to object to the sentencing Judge's application of the reasonable-doubt standard to determine the loss amount. We disagree. At the outset, our task is to resolve questions of law raised by a petitioner alleging that a district judge applied the wrong legal standard. While a party can waive his or her ability to appeal a ruling for failure to

15

In calculating the recommended Guidelines range for Ali, the District Judge rejected a preponderance standard for the loss calculation, and instead announced his intention to calculate the sentencing range according to his assessment of the loss amount proved beyond reasonable doubt.[10] The PSR for Ali specified a base offense level of six under U.S.S.G. § 2B1.1 for violation of 18 U.S.C. § 1341. It alleged that she and her co-conspirators misappropriated a total of $245,975.08 and that she and Delores Weaver were jointly and severally responsible for $206,326.32 of that amount. It thus added 12 points pursuant to § 2B1.1(b)(1)(G) (for a loss amount of over $200,000 but under

---

object, there can be no waiver here of the Judge's duty to apply the correct legal standard. Moreover, even if we were to conclude that defendants' argument should be evaluated under Fed. R. Crim. P. 51 (requiring contemporaneous objections to preserve the right to appeal a district court ruling), we would conclude that the Government has preserved this issue because it timely objected before the District Court. App. at 1587–90 (trial), 112 (sentencing), 179–80 (same); *cf. United States v. McCulligan*, 256 F.3d 97, 100–01 (3d Cir. 2001).

[10] Though the Judge never made an explicit finding as to loss amounts for any of the defendants, we presume that the restitution payments he ordered reflect his assessment of loss beyond a reasonable doubt. We call these figures the "low" loss amounts, and the figures calculated by the Government in the PSR (which correspond to the amounts alleged by a preponderance of the evidence) the "high" loss amounts.

16

$400,000) and another four points for Ali's major role in the offense pursuant to § 3B1.1(a). This yielded a total offense level of 22 coupled with a criminal offense category of I, for which the Guidelines advise a range of 41–51 months' imprisonment. The Court rejected the PSR's calculation. As noted, the Court did not state a finding of an exact loss amount, but ordered Ali to pay $30,000 in restitution. This amount requires a four-point addition to the base offense level pursuant to § 2B1.1(b)(1)(C) (for a loss amount of over $10,000 but under $30,000). The Judge adopted the PSR's determination that the base offense level was six, and having made his own determination of loss amount (yielding the four-point add-on), he presumably agreed that Ali's major role warranted another four-point enhancement. Added together, this yielded a total offense level of 14, which, in conjunction with a criminal history category of I, corresponds to a 15–21 month recommended imprisonment range.

With respect to Spicer, the District Court calculated the Guidelines range sentence based on the perjury offense.[11]

---

[11] In so doing, the Judge rejected the PSR's use of the mail fraud conviction (carrying a base offense level of six), which would have required him also to calculate Spicer's sentence based on loss amount. The PSR alleged that Spicer stole $71,000, and added eight points pursuant to U.S.S.G. § 2B1.1(b)(1)(E) (for a loss amount of over $70,000 but under $120,000), plus another two points pursuant to § 3C1.1 for

17

Section 2J1.3 of the Guidelines specifies a base offense level of 14 for violation of 18 U.S.C. § 1621. As there were no specific offense characteristics or adjustments applicable to this offense,[12] 14 was also the total offense level. Coupled with a

obstruction of justice (*i.e.*, the conviction for perjury to the grand jury during the investigation). Had the Judge applied the mail fraud conviction and calculated the loss, this would have resulted in a total offense level of 16, which—added to a criminal history category of I—would give an advisory Guidelines range of 21–27 months' imprisonment. In rejecting the PSR's eight-point enhancement for amount of loss, the Court determined that the total offense level for the mail fraud offense was lower than the total offense level for the perjury offense. (The Court did not make an explicit loss-determination for Spicer under § 2B1.1, but ordered her to pay $25,000 in restitution, which would have resulted in only a four-point enhancement, yielding a total offense level of only 12—a base offense level of six for the mail fraud conviction plus a four-level enhancement for loss amount and a two-level enhancement for obstruction of justice.)

[12] Amount of loss is not a specific offense characteristic for perjury. Moreover, except in circumstances not applicable here, the obstruction of justice adjustment under § 3C1.1 does not apply to perjury offenses. *See* § 3C1.1, app. note 7 ("If the defendant is convicted of an offense covered by . . . § 2J1.3 . . ., this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the

18

criminal history category of I, this total offense level corresponds to a 15–21 month recommended imprisonment range.

To reiterate, the appropriate burden for finding sentencing facts here is by a preponderance of the evidence. *See Grier*, 475 F.3d at 561. Loss amount is a sentencing fact (a specific offense characteristic), so it must be found by a preponderance of the evidence. "The court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, app. n.3(C); *see also United States v. Evans*, 155 F.3d 245, 252 (3d Cir. 1998).

By employing a reasonable-doubt standard rather than a preponderance standard in calculating the Guidelines at step one, the Judge here erred. He also failed to specify even a reasonable estimate of the loss amount for each defendant. Each of these three mistakes is legal error, rendering the resulting sentence unreasonable. As a result, we vacate the sentence and

---

obstruction offense itself . . . ."); *accord* § 2J1.3, app. note 2. Finally, we note that the cross reference in § 2J1.3(c), which requires application of § 2X3.1 in certain cases involving obstruction of an investigation or prosecution of a criminal offense (which occurred here), does not apply because the resulting offense level under that section is not greater than 14.

remand.[13]

## 2. Constitutional Claims

Defendants argue that the reasonable-doubt standard as applied here was correct, because to allow proof by a preponderance standard would raise constitutional concerns.

### a. Sixth Amendment

We have noted (*supra* note 2) that the sentencing Judge believed that, because of *Blakely*, any sentencing enhancements sought by the Government based on loss amount implicated defendants' Sixth Amendment guarantee to trial by an impartial jury in criminal cases. This, he concluded, required the facts that support those enhancements to be proved to a jury with evidence beyond a reasonable doubt.

However, other than the fact of a prior conviction, *Almendarez-Torres v. United States*, 523 U.S. 224, 239–47 (1998), "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury,

---

[13] Although we remand for resentencing to allow the Court to correct the sentencing calculation at step one, we continue our analysis of its sentencing determinations at steps two and three in order to provide guidance on related issues that arose here and, in some instances, also were incorrectly applied.

and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490;[14] *see also Grier*, 475 F.3d at 561–63. In other words, "the right to proof beyond a reasonable doubt attaches only when the [sentencing] facts at issue have the effect of increasing the maximum [statutory] punishment to which the defendant is exposed." *Grier*, 475 F.3d at 565–66 (citing *Apprendi*, 530 U.S. at 489–94).[15]

---

[14] The Supreme Court repeatedly has affirmed the *Apprendi* rule, applying it in multiple contexts. *See Cunningham*, 549 U.S. at __, 127 S. Ct. at 871 (applied to facts permitting judges to elevate a sentence beyond a "middle term" in a state determinate-sentencing law); *Booker*, 543 U.S. at 243–44 (applied to facts triggering a sentencing range elevation under the then-mandatory federal Guidelines); *Blakely*, 542 U.S. at 304–05 (applied to facts permitting a sentence in excess of the "standard range" in a state sentencing scheme); *Ring*, 536 U.S. at 609 (applied to facts subjecting a defendant to the death penalty); *see also Rita*, 551 U.S. at __, 127 S. Ct. at 2465–66 (recognizing the *Apprendi* rule but noting that it does not invalidate the reasonableness presumption for within-Guidelines sentences).

[15] As the District Judge here observed, *Blakely* indicated that the statutory maximum punishment to which *Apprendi* referred was the top of the Guidelines range accompanying a guilty verdict based on facts proved to a jury beyond a reasonable doubt. *Blakely*, 542 U.S. at 303–05. By making the Guidelines advisory, *Booker* transformed the maximums to those specified by Congress in the U.S. Code, which identifies the elements of

Differing loss amounts raise no such problem. After *Booker*, the statutory maximum to which *Apprendi* and *Blakely* refer is the maximum punishment in the U.S. Code for a certain crime. Section 1341 of Title 18, under which Ali was sentenced, sets a maximum fine and imprisonment term of $1,000,000 or 20 years, respectively, or both, for convictions of fraud that do not involve a financial institution (as here). Section 1621, under which Spicer was sentenced, permits violators to be fined and sets a maximum imprisonment term of five years, or both, for perjury convictions. The recommended Guidelines range sentences for Ali fall far below 20 years, whether the loss amount is calculated according to evidence proved by a preponderance (41–51 months) or beyond a reasonable doubt (15–21 months). Likewise, the recommended sentence for Spicer falls far below the five-year statutory maximum.

---

each offense and requires that only these facts be established beyond a reasonable doubt. *Booker*, 543 U.S. at 259; *see also Grier*, 475 F.3d at 564. The advisory Guidelines regime still requires judicial factfinding to inform individual sentencing decisions and to help meet the Sentencing Commission's twin-goals of sentencing—"uniformity and proportionality," *Rita*, 551 U.S. at __, 127 S. Ct. at 2464 (emphases in original omitted). But this requirement does not curtail a judge's ability to exercise broad discretion in determining a final sentence at step three when taking into account the § 3553(a) factors. *Booker*, 543 U.S. at 233; *Grier*, 475 F.3d at 569.

22

The Judge here was mistaken as to what *Blakely* requires to show sentencing facts. This mistake led to his erroneous calculation of the Guidelines range. Because the differing loss amounts do not increase defendants' sentences beyond the statutory maximums, there is no Sixth Amendment concern here with applying a preponderance standard for the sentencing calculation.

### b.     Fifth Amendment

Defendants argue that the Due Process Clause of the Fifth Amendment requires sentencing enhancements to be proved beyond a reasonable doubt. Following the briefing and argument of this case, however, an *en banc* majority of our Court considered this precise contention and rejected it. *See Grier*, 475 F.3d at 565–66 ("By excising the provisions of the United States Code requiring mandatory application of the United States Sentencing Guidelines, the Supreme Court in *Booker* altered the constitutional impact of the Guidelines. None of the facts relevant to enhancements or departures under the Guidelines can increase the maximum punishment to which the defendant is exposed. The Due Process Clause thus affords no right to have these facts proved beyond a reasonable doubt.") (internal citations omitted). We follow suit.

### c.     Constitutional Avoidance

Defendants also point to these same constitutional

23

concerns to urge us to apply the doctrine of constitutional avoidance and read the Guidelines to require proof beyond a reasonable doubt. *See Jones v. United States*, 526 U.S. 227, 239 (1999) ("'[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.'") (quoting *United States ex rel. Att'y Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909)). This canon is out-of-place here because it applies to statutory interpretation only where there is doubt whether "an otherwise acceptable construction of a statute would raise serious constitutional problems." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). Because there is no constitutional doubt, defendants' arguments do not alter our conclusion that the Judge committed legal error because he failed to apply the preponderance standard to determine the loss amount.

### B.     Step Two: Departure Determinations

### 1.     Legal Framework

Similar to our approach at step one, "we require that the entirety of the Guidelines calculation be done correctly, including rulings on Guidelines departures" at step two. *United States v. Jackson*, 467 F.3d 834, 838 (3d Cir. 2006); *see also Gunter*, 462 F.3d at 247; *King*, 454 F.3d at 194; *Cooper*, 437 F.3d at 329. As with our conclusion concerning the proper

24

standard of proof for finding sentencing facts, generally "there is every reason to believe that the Supreme Court intended that the practices that have guided us and other courts in the twenty years since the Guidelines were first promulgated would continue to govern sentencing in the federal courts." *Grier*, 475 F.3d at 561. *Booker* itself suggested as much, 543 U.S. at 260–61 (discussing "the past two decades of appellate practice in cases involving departures"), as did *Rita*, 551 U.S. at __, 127 S. Ct. at 2465 (noting that, after calculating the Guidelines, the sentencing judge "may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because . . . [, *inter alia*,] . . . (as the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply . . . .").

Thus sentencing courts should continue to "treat each [sentencing factor] as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G. § 1A1.1 cmt. 4(b); *see also United States v. Sweeting*, 213 F.3d 95, 99 (3d Cir. 2000). Where the defendant's conduct falls outside the "heartland" of cases, a district court may determine whether a departure is appropriate. *United States v. Iannone*, 184 F.3d, 214, 226 (3d Cir. 1999); *see also Sweeting*, 213 F.3d at 99. "The Guidelines permit departures from the prescribed sentencing range in cases in which the judge 'finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that

25

should result in a sentence different from that described.'" *Booker*, 543 U.S. at 234 (quoting 18 U.S.C. § 3553(b)(1)); *Sweeting*, 213 F.3d at 99.

In *Koon v. United States*, the Supreme Court outlined what is required of sentencing courts when considering a departure from the applicable Guidelines range. 518 U.S. 81, 92–96 (1996). In applying the *Koon* analysis, we have described the process as follows:

> First, identify the factor or factors that potentially take the case outside the Guidelines' "heartland" and make it special or unusual. Second, determine whether the Guidelines forbid departures based on the factor, encourage departures based on the factor, or do not mention the factor at all. Third, apply the appropriate rule: (1) if the factor is forbidden, the court cannot use it as a basis for departure; (2) if the factor is encouraged, the court is authorized to depart if the applicable guideline does not already take it into account; (3) if the factor is discouraged, or encouraged but

26

already taken into account by the applicable guideline, the court should depart only if the factor is present to an exceptional degree, or in some other way makes the case different from the ordinary case in which the factor is present; or (4) if the factor is unmentioned, "the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether [the factor] is sufficient to take the case out of the Guideline's heartland."

*United States v. Serafini*, 233 F.3d 758, 772 (3d Cir. 2000) (quoting *Iannone*, 184 F.3d at 226).

In our review of these sentences for reasonableness, we assess the extent to which the sentencing court followed the proper procedures to depart at step two from the recommended sentencing range. *Jackson*, 467 F.3d at 838. That query includes consideration of "whether the factors relied on [by the district court] are appropriate bases for departure," *Kikumura*, 918 F.2d at 1110 (brackets original, citations and quotation marks omitted); *Jackson*, 467 F.3d at 838.

27

## 2.    Analysis

Here the sentencing Judge identified four bases for his departure downward from the initial Guidelines calculations: (1) defendants' good works and community support, (2) their lack of an initial intent to defraud, (3) Spicer's minor role, and (4) the "exculpatory no" doctrine in Spicer's case. We evaluate each according to the criteria of *Koon*, with particular emphasis on the first basis—good works and community support—on which the Judge and the parties rely most.

### a.    Good works and community support

The Judge stated that a downward departure was appropriate largely because of defendants' "exemplary record of public service" and charitable works, as demonstrated by the "tremendous outpouring of public support." App. at 231.[16]

---

[16] In a dramatic moment at the sentencing hearings, defense counsel announced that he "would like the Court and the record to reflect the amount of people that have come into this courtroom for both Lakiha and Azheem Spicer, and [] would ask them to rise, . . . [to] get an accurate—some type of accurate indication for the record." App. at 145. The Judge duly noted that the full courtroom of over 150 supporters stood up. App. at 145, 197.

Public service and good works are discouraged bases for departures. *See* U.S.S.G. § 5H1.11 ("Military, civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted."); *Fred Cooper*; 394 F.3d at 176. Under the *Koon* analysis, the Court should have departed only if the works were "exceptional." *Serafini*, 233 F.3d at 772; *see also Fred Cooper*, 394 F.3d at 176.

"Exceptional" works involve acts that are both "substantial" and "personal" in nature. *Id.* at 177. They are "evaluated with reference to the offender's wealth and status in life. More is expected of [those] who enjoy sufficient income and community status[, as] . . . they have the opportunities to engage in charitable and benevolent activities." *Id.* at 176 (citations and quotation marks omitted). Notably, in passing the PROTECT Act (which stands for "Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today"), Pub. L. No. 108-021, in 2003, Congress has expressed a "'disinclination towards leniency for white collar criminals . . . and its frustration with the fact that these defendants receive probation more often than other offenders who commit crimes of comparable severity." *Id.* at 179 (Sloviter, J., dissenting) (citations omitted). For this reason, "exceptional," as applied to charitable works, is a "hard standard to meet," *United States v. Wright*, 363 F.3d 237, 248 (3d Cir. 2004), and thus it is applied

29

in very few cases.[17]

In *Fred Cooper*, the District Court received 24 letters pleading for leniency because of Cooper's charitable donations and activities. 394 F.3d at 174. The Judge granted a four-level downward departure on that basis, and sentenced Cooper to six months' house arrest and another 30 months' probation, expressing his belief that Cooper's "community and charitable activities have been truly exceptional, and that's just not the amount of money he spent on the things, but also the amount of personal effort, and work, and help that he has given to so many people." *Id.* at 175.

---

[17] Most appeals courts follow a similarly high standard when determining whether good works warrant a departure in analogous situations. *E.g.*, *United States v. Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (no downward departure for extensive community involvement that spanned 25 years because that was typical of business executives); *United States v. Morken*, 133 F.3d 628 (8th Cir. 1998) (no downward departure for a high-profile businessman who advised local business, hired youth, served on his church's council, and raised money for charity); *United States v. Rybicki*, 96 F.3d 754, 758–59 (4th Cir. 1996) (no downward departure for a highly decorated Vietnam war veteran for saving an innocent civilian during the war and serving with the Secret Service); *United States v. McHan*, 920 F.2d 244, 247 (4th Cir. 1990) (no downward departure despite work history, family ties and responsibilities, plus sizable contributions to economic well-being of defendant's town).

We affirmed, noting that Cooper's acts were

> not the detached acts of charity one
> might ordinarily expect from a
> wealthy business executive. They
> [were,] in a very real way, hands-on
> personal sacrifices, which have had
> a dramatic and personal impact on
> the lives of others. [In addition,]
> when compared with a similarly-
> situated defendant who received a
> downward departure based on good
> works, Cooper fares well.

*Id.* at 177 (citations omitted). For support, we cited *Serafini*, which affirmed a downward departure for a politician convicted for violating election finance laws and perjury because of the personal nature of several exceptional community works, as described in several letters written to the sentencing judge asking for leniency. 233 F.3d at 774, 776; *see also United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998) (upholding a downward departure for defendant's charitable activities, including bringing two troubled young women into her home).[18]

---

[18] The First Circuit Court of Appeals has taken a different approach. In *United States v. Thurston*, the District Court departed downward from a then-mandatory prison sentence of 60 months for a Medicare fraud conviction on the basis of good

works (including taking family members and others into defendant's home for several weeks, tithing 10% of his income, and devoting several hours per week to community service). 358 F.3d 51, 79 (1st Cir. 2004) (*Thurston I*), *vacated by* 543 U.S. 1097 (2005) (for consideration in light of *Booker*). The District Court sentenced defendant William Thurston to three months' imprisonment with the recommendation that the time be served in a halfway house, 24 months' supervised release, and no fine. *Id.* at 54. The First Circuit Court reversed, concluding that the good-works departure was improper because Thurston's acts were not "exceptional" in light of the nature of the offense and his occupation as a wealthy corporate executive with the means to undertake significant charitable causes, and instructed the District Court to apply the mandatory 60-month sentence. *Id.* at 79. (Signaling our disagreement with the First Circuit, we commented that, like *Serafini*, "the good works in *Thurston* could also be construed as personal in nature[,] . . . and thus that case would be more difficult to distinguish [from *Fred Cooper*] . . . ." *Fred Cooper*, 394 F.3d at 178 (citing *Thurston I*, 358 F.3d at 78).) On resentencing, the District Court again imposed essentially the same sentence, with the addition of a $25,000 fine. The First Circuit Court again reversed the departure and remanded, this time with instructions to the District Court to impose a sentence not less than 36 months' imprisonment under the now-advisory Guidelines scheme. *United States v. Thurston*, 456 F.3d 211, 219–20 (1st Cir. 2006) (*Thurston II*). Thurston has filed a petition for writ of certiorari with the Supreme Court, No. 06-378, 75 U.S.L.W. 3121 (Sept. 14, 2006), which implicates concerns expected to be resolved by the Supreme

The record here contains a number of attestations to the charitable acts of Ali (mainly) and Spicer. It also notes that Ali received numerous citations and awards from the likes of then-Philadelphia Mayor Edward G. Rendell (currently the Governor of Pennsylvania), the Pennsylvania House of Representatives, and the City of Philadelphia, between 1985 and 1996. In addition, several witnesses testified regarding Ali's good works at the sentencing hearing, and 123 individuals wrote letters to the sentencing judge on behalf of Ali and her children.

A review of the testimony and the letters shows that Ali's charitable works consisted largely of her financial generosity, a few personal charitable actions, and duties carried out in the course of her employment at the School. The letters praise Spicer for being a law-abiding citizen generally and sometimes helping at the School. Regardless whether we agree with the sentencing Judge's assessment, we find it within the bounds of reason that he observed that Ali partook in the type of "sustained" and "personal" acts that would warrant a departure under *Serafini-Cooper*.[19]

---

Court this Term in *Gall*, No. 06-7949, 127 S. Ct. 2933. *See supra* note 6.

[19] For example, Ali helped organize fundraising banquets for the School, App. at 1364–1411, contributed her "personal assistance from leading to scrubbing floors," App. at 1413, spent several hours "counseling and comforting" a student's parent

But there are few—if any—attestations of charity of a "sustained" and "personal" nature with regard to Spicer. Most acts described seem "ordinary," in that they occurred in the course of work with the School or family members and involved no special sacrifice. Thus we cannot conclude that Spicer's actions here met the *Serafini-Cooper* definition of "exceptional" or that a departure for good works for either defendant would align easily with the Guidelines' advice to the contrary or with congressional policy of not privileging prominent citizens by allowing them to avoid prison time.

For charitable works to justify a departure, they must work in tandem with other valid departure factors, the possibility of which is called into question in the discussion below. *See United States v. Tomko*, 498 F.3d 157, 171–73 (3d Cir. 2007) (concluding that the charitable works alone did not justify a downward variance). Accordingly, we urge the Judge on remand to provide detailed explanation as to why the record justifies a departure for either or both of the defendants.

### b.     No initial intent to defraud

The Judge next expressed his view that defendants were well-meaning individuals who had no intention initially to

---

who was struggling to overcome drug-addiction, App. at 1430, and became the "legal guardian" to two nieces to ensure that they attended better schools, App. at 1415, 1482.

34

defraud the Government.[20]  Section § 2B1.1 of the Guidelines

---

[20] In this regard, he stated:

> [B]ased on the evidence presented at trial, as well as the arguments here today, it has always been clear to me that none of these defendants started out with the intention of defrauding anybody.  What they started out with was an opportunity to get some money by teaching at the Community College in this special program of outreach to the community. . . .  [T]he outreach program, the adult education program, was very sloppily put together. . . . I have no doubt that, when the defendants were first hired by the Community College, they, in good faith, expected to teach classes.  And, they did start out teaching classes.  And then, everybody who was supposed to be coming to the class lost enthusiasm, and the whole thing kind of fell apart.  And, these defendants stayed in it too long and collected money they weren't entitled to.  But it's not the kind of case where people

makes no mention of fraud that was not intentional at the outset, no doubt because intent to defraud is an element of the crime itself. In that circumstance, under *Koon* a court should consider the "structure and theory" of the Guidelines pertaining to fraud and the Guidelines as a whole to determine whether the facts are "sufficient to take the case out of the Guidelines' 'heartland.'" *Serafini*, 233 F.3d at 772. The Court here engaged in no such structural or analogic analysis. If it had, it likely would have determined that the structure of § 2B1.1 indicates that this case of fraud was average because this section focuses on the loss amounts accompanying actual convictions for fraud, rather than whether intent to defraud existed at the outset.

The Judge's quarrel seems to be not with the culpability for fraud—for which there is a jury conviction—but the duration of the fraudulent scheme and thus the appropriate loss amount

---

set out originally to defraud anybody.

App. at 158–59 (Spicer's Sentencing Hr'g); *accord* App. at 233 (Ali's Sentencing Hr'g) ("[E]verybody was well intentioned at the start[;] they wanted to do some good in the community and saw this as an opportunity to finance the Sister Clara School to some extent and also to help the people in the community. Undoubtedly, as I said before, there came a point when it should have been and obviously was apparent . . . that this was a scam and wasn't working out in the way it should have.").

36

associated with that scheme. In our view, it is inappropriate to consider intent as a departure factor because of doubts about loss amount, particularly when, as here, the crime of conviction already specified an intent element.[21] Moreover, there is nothing to suggest that any lack of intent here—even if it were an appropriate ground for departure—is sufficient to take this outside of the heartland under the *Koon* analysis for unmentioned factors. As such, we cannot affirm the downward departure on the ground of a lack of an initial intent to defraud.

### c. Minor role

The Judge determined that Spicer played a minor role in this scheme, further justifying a downward departure. "It's true," he stated, "that [Lakiha and Azheem Spicer] did receive the money. But at least with respect to the people who were

---

[21] Any such doubts are addressed more appropriately at step one, when estimating the loss amount, or at step three, when considering relevant § 3553(a) factors. For example, if the Judge determined by a preponderance of evidence that the fraudulent intent occurred one year after the establishment of the program (rather than for the entire two-year period as alleged by the Government), he would come up with a reasonable estimate of the loss amount from his estimate of the date on which defendants began the crime, and thus the date from which they were liable for losses to the Government. We discuss the step three considerations below.

37

behind arranging matters so that the matter would continue to flow, even though no classes were being held, I don't think these defendants are chargeable with that aspect of it." App. at 163. Minor role is not a departure factor. Instead, it is an adjustment under the Guidelines calculation at step one, which provides for a two-point reduction from the offense level for defendants less culpable than most other participants, but whose role cannot be described as minimal. *See* U.S.S.G. § 3B1.2 app. note 5.

Applying the *Koon* analysis, the District Court should have concluded that this factor is "encouraged but already taken into account by the applicable guideline [*i.e.*, § 3B1.2]," and calls for a "depart[ure] only if the factor is present to an exceptional degree, or in some other way makes the case different from the ordinary case in which the factor is present." *Serafini*, 233 F.3d at 772 (citations omitted). The Court failed to outline whether or how the "minor role" was exceptional. It thus should not have granted a downward departure on this basis.

### d. "Exculpatory no" doctrine

Finally, the Judge determined that the "exculpatory no" doctrine warranted a lower sentence for Spicer with respect to her perjury charge. He reasoned that "the perjury [that] she committed was not much different from a simple denial of guilt, and therefore "is not ['traditionally'] regarded as a punishable

perjury." App. at 160–61, 164 (Spicer's Sentencing Hr'g).

A downward departure from the Guidelines range for perjury could have been appropriate only if the sentencing court found that the circumstances were such as to remove Spicer's perjury from the "heartland" of perjury cases. Spicer was convicted under 18 U.S.C. § 1621 of knowingly making a false statement under oath to the grand jury investigating the CCP fraud scheme. When asked whether she "actually [taught] on site at [the School] for every hour for which [she was] paid by the [CCP]," Spicer responded, "Yes." The jury found that this statement was made under oath, that it was false, and that it was material to whether a fraud against the Government had been committed. This would appear to put it squarely within the § 1621 perjury cases. We fail to see how the fact that Spicer's lie tended to be exculpatory from her perspective moves it beyond the heartland. There are undoubtedly many perjury convictions that arise from false testimony tending to exculpate the defendant.[22] A downward departure from the Guidelines range

_____

[22] As noted, *supra* note 4, the "exculpatory no" doctrine was a judicially crafted one applicable only to prosecutions under 18 U.S.C. § 1001, which makes it a crime knowingly to make a false statement to a federal agency (under oath or not). So far as we can determine, it has never been applied in the context of 18 U.S.C. § 1621, which requires a knowingly false statement made under oath or "under penalty of perjury." Even in the context of § 1001, however, the doctrine and the rationale behind it were

was, accordingly, error.

* * * * *

In sum, none of the factors on which the District Judge relied presented a "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b)(1). Good works and community service are discouraged factors under the Guidelines, and in any event the Judge has not explained how Ali and/or Spicer's charitable activities were so exceptional, as we have interpreted that term in *Serafini* and *Fred Cooper*, as to warrant a downward departure, particularly if they constitute the sole valid departure factor. Lack of fraudulent intent is unmentioned, but it seems implausible that it should be considered at this stage because intent was an element of the conviction for which defendants are to be sentenced under the Guidelines. Even if lack of intent were to be considered, there is nothing on this record indicating that the sentence for fraud here was outside the heartland of fraud cases. Minor participation has already been taken into account by the Guidelines' two-level reduction, and there is nothing to suggest that Spicer's level of culpability is so

---

rejected by the Supreme Court in *Brogan v. United States*, 522 U.S. 398, 404–05 (1998). Clearly the "exculpatory no" doctrine has no applicability here.

exceptionally low as to warrant a downward departure. The "exculpatory no" doctrine has no place here, as Spicer perjured herself before the grand jury. For these reasons, we conclude that—absent further explanation regarding charitable works—the Judge erred in granting downward departures on these grounds.[23]

## C.     Step 3: Relevant § 3553(a) Factors

At step three, a sentencing court must "state in open court the reasons for its imposition of the particular sentence," 18 U.S.C. § 3553(c), particularly where, as here, it chooses to "var[y] significantly from the advisory Guidelines range . . . ." *United States v. Kononchuk*, 485 F.3d 199, 204 (3d Cir. 2007). There are "no magic words" that it must invoke when doing so. *Cooper*, 437 F.3d at 332; *see also Rita*, 551 U.S. at __, 127 S. Ct. at 2468 ("The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances."). Rather, we require courts generally to give

---

[23] We are well aware that when he imposed sentence the District Judge did not have the benefit of our opinion in *United States v. Vampire Nation*, 451 F.3d 189, 195 n.2 (3d Cir. 2006), and it may be that he intended to make a variance from the Guidelines rather than a departure. If that is the case, the foregoing heartland analysis would not be necessary and we would review for reasonableness. *Cooper*, 437 F.3d at 326–27. This can be clarified on remand.

41

"meaningful consideration to the relevant § 3553(a) factors,"[24]

---

[24] The factors set out in 18 U.S.C. § 3553(a) are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and sentencing range established for—
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;
> (5) any pertinent policy statement . . . issued by the Sentencing Commission . . . that . . . is in

42

*Gunter*, 462 F.3d at 247 (quoting *Cooper*, 437 F.3d at 329) (quotation marks and brackets omitted), and "state adequate reasons for a sentence on the record so that this court can engage in meaningful appellate review." *King*, 454 F.3d at 196. Where a court varies, and a party has raised cogent "objections with legal merit that the variance is unjustified by the record," we require the court to "explain why the variance is justified, . . . [with] explanations of the relevant sentencing factors [that] go beyond mere formalism." *Kononchuk*, 485 F.3d at 204; *see also Jackson*, 467 F.3d at 841. Though the Supreme Court has not yet ruled on how sentencing judges must approach outside-of-Guidelines range sentences after *Booker*, it signaled agreement with our approach:

> [While within-Guidelines range sentences] will not necessarily require a lengthy explanation, . . . [w]here the defendant or prosecutor presents nonfrivolous reasons for imposing a different sentence . . .

effect on the date the defendant is sentenced[;] (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

43

> the judge will normally go further and explain why he has rejected those arguments. . . . Where the judge imposes a sentence outside the Guidelines, the judge will explain why he has done so.

*Rita*, 551 U.S. at __, 127 S. Ct. at 2468.

Here, the Judge's step-three analysis was flawed. The principal error occurred with respect to factor § 3553(a)(4), which requires meaningful consideration of the advisory Guidelines range for a conviction. We have outlined above why the application of a reasonable-doubt standard to determining the loss amount was legal error, and how that error resulted in an erroneous Guidelines calculation at step one. We have also explained how the Judge erred at step two when he relied on inappropriate or non-extraordinary factors to support his decision to depart downward. With an incorrectly calculated Guidelines range and an improper departure determination, the Judge necessarily was unable meaningfully to consider the recommended Guidelines range as required by § 3553(a)(4). Put simply, the preliminary errors at steps one and two tainted the step three analysis and resulting sentence.[25]

---

[25] In addition, when considering the § 3553(a) factors during Spicer's sentencing, the District Court remarked that "when we get to the point of punishment, there can be no doubt that

44

[Spicer and co-defendant Azheem Spicer] have, to some extent, been punished already because of the public shame and humiliation and the exposure to ridicule and exposure to unwanted publicity and so-forth[,] . . . [so] they have already suffered to some extent."  App. at 162.  The Supreme Court recognized in *Koon* that adverse publicity may serve as a proper basis for downward departure in certain narrow circumstances. *See Koon*, 518 U.S. at 112 (concluding that the "widespread publicity and emotional outrage" that surrounded the beating of Rodney King made defendant police officers "particularly likely to be targets of abuse during their incarceration" and justified a downward departure).

If analyzed as a departure factor, adverse publicity cannot justify a downward departure here, as Spicer has not demonstrated anything extraordinary about her case that would bring it outside the heartland of cases involving relatively prominent local figures convicted of stealing public funds.  If analyzed as a § 3553(a) factor, adverse publicity alone cannot support the substantial variance awarded here (in percentage, if not absolute, terms), even if the Judge found within his discretion that it supported certain penological goals, thus offsetting the sentence somewhat.  Although courts have "'greater latitude'" after *Booker* to consider sentencing factors framed as § 3553(a) variances, *United States v. Jackson*, 467 F.3d 834, 842 n.8 (3d Cir. 2006) (quoting *United States v. McBride*, 434 F.3d 470, 476 (6th Cir. 2006)), they must justify substantial variances with compelling reasons.  *See United States v. Manzella*, 475 F.3d 152, 161 (3d Cir. 2007) ("[T]he more that a sentence varies from the advisory Guidelines range,

45

The Judge's concerns throughout this sentencing process revolved around his view that loss amounts drive sentences in contexts like these, and he apparently did not believe that the amounts alleged by the Government reflect accurately the offense for which defendants are culpable. The principal issue here, then, concerns a situation where a sentencing fact drives the Guidelines sentences, but the Judge has reservations about the strength of the evidence. Here, he doubted that the evidence of loss applied to the two-year duration of the crime alleged by the Government and thus doubted whether the evidence was strong enough to support the final Guidelines-recommended range. *Booker* afforded judges broad discretion to enter appropriate sentences in consideration of § 3553(a) factors.[26]

the more compelling the supporting reasons must be."). We see no compelling reasons offered here.

[26] We note that, in the exercise of their discretion, some sentencing judges have addressed doubts about the strength of the evidence in support of facts driving a sentence by declining to add a heavy thumb to the § 3553(a)(4) scale—the Guidelines range. For example, district courts have compared the Guidelines advice to the sentence that would be reached through applying a reasonable-doubt standard for determining Guidelines-driven sentencing facts, and—in considering the § 3553(a) factors—rejected the Guidelines advice when it diverged too far from the reasonable-doubt result. *United States v. Gray*, 362 F. Supp. 2d 714, 720, 723 (S.D.W.Va. 2005); *see also United States v. Kandirakis*, 441 F. Supp. 2d 282, 322 (D.

But under *Grier* it is not within a sentencing judge's discretion to diverge from applying the preponderance-of-the evidence standard in the initial sentencing calculation at step one or employing appropriate departure factors at step two. In light of the step-one calculation error and the flawed departure analysis at step two, we vacate both sentences and remand for resentencing.

---

Mass. 2006) (submitting enhancement facts to an advisory jury at sentencing); *id.* at 328–29 (citing other cases where district courts have considered sentencing facts proved by evidence stronger than a preponderance). We also note that the Seventh Circuit Court has affirmed such practices, in efforts to avoid placing restrictions on the sentencing judge's discretion, and thereby avoid rendering the advisory Guidelines effectively mandatory in contravention of *Booker*. *E.g.*, *United States v. Reuter*, 463 F.3d 792, 793 (7th Cir. 2006) ("A judge might reasonably conclude that a sentence based almost entirely on evidence that satisfied only the normal civil standard of proof would be unlikely to promote respect for the law or provide just punishment for the offense of conviction. That would be a judgment for the sentencing judge to make and we would uphold it so long as it was reasonable in the circumstances."). The continuing validity of these approaches awaits the Supreme Court's decisions in *Gall* and *Kimbrough* this Term.