# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KENYA ALI HYATT,

Defendant-Appellant.

FOR PUBLICATION
July 21, 2016
9:10 a.m.

No. 325741
Genesee Circuit Court
LC No. 13-032654-FC

Before: SHAPIRO, P.J., and MARKEY, METER, BECKERING, STEPHENS, M.J. KELLY, and RIORDAN, JJ.

BECKERING, J.

Pursuant to MCR 7.215(J), this Court convened a special conflict panel to resolve the conflict between the previous opinion issued in this case in *People v Perkins*,[1] __ Mich App __; __ NW2d __ (2016) (Docket Nos. 323454; 323876; 325741), and the decision issued in *People v Skinner*, 312 Mich App 15; 877 NW2d 482 (2015). The issue involves whether a juvenile the prosecution seeks to subject to a sentence of life without parole under MCL 769.25 is entitled, under the Sixth Amendment to the United States Constitution, to have a jury determine whether life without parole is warranted. As evidenced by the existence of this special conflict panel, we recognize that this is a difficult issue. Also not lost on this panel is the understanding that juveniles who commit a heinous offense, while undoubtedly deserving of punishment, are categorically less culpable than their adult counterparts and are less deserving of the maximum punishment available under the law. As the United States Supreme Court has made unmistakably clear, it is only the truly rare juvenile who will be deserving of the harshest penalty available under the laws of this state, and a life-without-parole sentence is an unconstitutional penalty for all juveniles but for those whose crimes reflect irreparable corruption. Thus, while we conclude that a judge, not a jury, is to make this determination, the sentencing judge must honor the mandate that was made abundantly clear in *Miller v Alabama*, 576 US __; 132 S Ct

---

[1] The instant matter involving defendant, Kenya Hyatt, was initially consolidated with Docket Nos. 323454 and 323876, but this Court has since, on its own motion, vacated its previous order consolidating the cases in order to allow defendant Hyatt's case to proceed on its own before this special conflict panel. *People v Perkins*, unpublished order of the Court of Appeals, (Docket Nos. 323454; 323876; 325741, issued April 26, 2016).

-1-

2455, 2469; 183 L Ed 2d 407 (2012), and other recent Eighth Amendment caselaw: life without parole is to be reserved for only the rarest of juvenile offenders so as to avoid imposing an unconstitutionally disproportionate life-without-parole sentence on a transiently immature offender. Such mandate necessarily affects not only the way a trial court is to exercise its discretion when meting out punishment, but also the way an appellate court is to review a life-without-parole sentence for a juvenile offender. In short, youth matters when it comes to sentencing, and our courts, at sentencing and on appeal, must carefully take this into account when going about the exceedingly difficult task of determining whether a juvenile is irreparably corrupt—meaning incapable of rehabilitation for the remainder of his or her life—in order to avoid an unconstitutional sentence.

## I. FACTS

The facts of this case are fully set forth in the prior opinion and need not bear repeating, save for a few pertinent details. Following trial, a jury convicted defendant Hyatt of first-degree felony murder, conspiracy to commit armed robbery, armed robbery, and felony-firearm. At a sentencing hearing required by MCL 769.25(6), the trial court decided to sentence defendant, who was 17 years old at the time of the offenses, to life without the possibility of parole on the first-degree murder conviction. The prior panel reversed his sentence because the trial judge, not a jury, was the sentencer, and because it was bound to follow the decision reached by the majority in *Skinner*, 312 Mich App 15. Nevertheless, the prior panel in the instant case noted that but for *Skinner*, it would have affirmed the sentence because it concluded that a judge, not a jury, was to determine a juvenile's eligibility for a life-without-parole sentence under MCL 769.25. Because it disagreed with *Skinner* on this point, the prior panel declared a conflict with *Skinner*.

## II. STANDARD OF REVIEW

Resolution of the conflict in this case requires us to construe MCL 769.25 and to examine defendant's constitutional rights under the Sixth Amendment and the Eighth Amendment to the United States Constitution. We review de novo these issues of law. *People v Humphrey*, 312 Mich App 309, 314; 877 NW2d 770 (2015); *People v Al-Shara*, 311 Mich App 560, 567; 876 NW2d 826 (2015).

## III. ANALYSIS

As was recognized in *Skinner* and by the prior panel in this case, the instant case involves the confluence of Sixth Amendment and Eighth Amendment jurisprudence. We begin by briefly touching on the pertinent Eighth Amendment caselaw.

### A. RECENT EIGHTH AMENDMENT CASELAW

#### 1. *MILLER V. ALABAMA*

In *Miller v Alabama*, 576 US __; 132 S Ct 2455, 2469; 183 L Ed 2d 407 (2012), the United States Supreme Court considered an Eighth Amendment challenge to mandatory life-without-parole sentences for juvenile offenders in homicide cases and concluded that "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison

sentence [life without parole], such a scheme poses too great a risk of disproportionate punishment." The Court emphasized that the unique characteristics of youth warranted treating juveniles differently from adults for purposes of sentencing. In particular, drawing on past Eighth Amendment precedent in *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005) (imposing a categorical ban on capital punishment for all juvenile offenders), and *Graham v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010) (banning life-without-parole sentences for juveniles in non-homicide cases), the Court noted that juveniles have "lesser culpability" and a greater capacity for reform and thus "are constitutionally different from adults for purposes of sentencing." *Miller*, 132 S Ct at 2463-2464. Specifically, the Court explained that *Roper* and *Graham* recognize "three significant gaps between juveniles and adults":

> First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable . . . to negative influences and outside pressures, including from their family and peers; they have limited contro[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievabl[e] deprav[ity]. [*Id.* at 2464 (citations and quotation marks omitted; alterations in original).]

In addition to noting that the characteristics of youth warranted treating juveniles differently, the Court noted the severity of a life-without-parole sentence for juveniles. Particularly, the Court took notice of the idea that the majority in *Graham* "likened life without parole for juveniles to the death penalty itself . . . ." *Id.* at 2463. See also *Graham*, 560 US at 69-71. The *Graham* majority did so by noting that life without parole was especially harsh for a juvenile offender, who will "almost inevitably serve 'more years and a greater percentage of his life in prison than an adult offender.' " *Miller*, 132 US at 2466, quoting *Graham*, 560 US at 70. And given that *Roper* categorically banned the death penalty for juvenile offenders, life without parole became the "ultimate penalty for juveniles . . . ." *Miller*, 132 US at 2466. Because *Graham* likened life without parole for juveniles to the death penalty, the Court reasoned that *Graham* made relevant to the issue at hand death-penalty caselaw, which imposed the requirement of individualized sentencing pursuant to which the offender's character and record, along with the circumstances of the offense and other mitigating or aggravating factors, were to be considered. *Id.* at 2467 (citations omitted).

In light of characteristics of youth and pertinent Eighth Amendment precedent, the Court concluded that mandatory life-without-parole sentencing schemes for juveniles, "by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id.* "And still worse," continued the Court, "each juvenile (including these two 14–year–olds) will receive the same sentence as the vast majority of adults committing similar homicide offenses—but really, as *Graham* noted, a *greater* sentence than those adults will serve." *Id.* at 2468. Accordingly, the Court barred mandatory life-without-parole sentences for juvenile offenders in homicide cases and provided a number of non-

exhaustive factors[2] that a sentencer should consider before imposing a life-without-parole sentence:

> . . . Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [*Id*.]

The Court stopped short of considering a categorical ban on life-without-parole sentences for juveniles because that issue was not before it, but held that the Eighth Amendment forbade the imposition of a mandatory penalty because it "prevent[s] the sentencer from taking account of" the offender's youthfulness, diminished culpability, and increased potential for reform. *Id*. at 2466. Yet, while not imposing a categorical ban, the Court was careful to note that because of a juvenile's "diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id*. at 2469. "That is especially so," reasoned the Court, "because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id*. (citations and quotation marks omitted).

## 2. *MONTGOMERY V. LOUISIANA*

The first—and perhaps most pressing—issue left in *Miller*'s wake was the issue of retroactivity. A number of states took aim at this issue, including this Court and the Michigan Supreme Court.[3] The United States Supreme Court resolved this issue in *Montgomery v Louisiana*, __ US __; 136 S Ct 718; 193 L Ed 2d 599 (2016), a case of which neither *Skinner* nor *Hyatt* had the benefit. The majority ruled—in a holding that is not of particular relevance for resolving the issue in the present case—that *Miller* applied retroactively. *Id*. at 736. More relevant to our discussion in the instant case was *Montgomery*'s admonition—continued from *Miller*—that "a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect irreparable corruption." *Id*. at 726 (citation and quotation marks omitted). The Court also acknowledged, in the context of concluding that the rule in *Miller* was substantive and thus subject to retroactive application, that *Miller* did not forbid states from imposing life-without-parole sentences altogether. *Id*. at 734. However, *Miller* nevertheless

---

[2] As will be discussed, our Legislature, in MCL 769.25, dubbed these the "*Miller* factors."

[3] See *People v Carp*, 496 Mich 440; 852 NW2d 801 (2014).

barred life without parole "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility"; thus, "[f]or that reason, *Miller* is no less substantive than are *Roper* and *Graham*." *Id*.

Also relevant to our discussion, the Court in *Montgomery* acknowledged that *Miller*'s holding, while substantive, nevertheless "has a procedural component" in that it requires "a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id*. This procedural component—a hearing at which " 'youth and its attendant characteristics' are considered as sentencing factors"—was necessary to give effect to *Miller*'s "substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id*. at 735. The Supreme Court, in rejecting an argument made in that case, acknowledged that *Miller* did not require trial courts to make findings of fact regarding a child's "incorrigibility." *Id*. However, "[t]hat *Miller* did not impose a formal factfinding requirement does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." *Id*. In the absence of express procedural requirements or factfinding requirements set forth in *Miller*, the Court in *Montgomery* emphasized that it was incumbent upon states to develop procedures to enforce *Miller*'s substantive guarantee of individualized sentencing for juvenile offenders facing the possibility of life without parole. *Id*.

## B. MCL 769.25—OUR RESPONSE TO *MILLER*

In response to *Miller*'s directive about individualized sentencing, our Legislature enacted 2014 PA 22 which included, relevant to our purposes in the instant case, MCL 769.25. For certain, enumerated homicide offenses, the statute allowed the prosecuting attorney to "file a motion under this section to sentence" a juvenile offender "to imprisonment for life without the possibility of parole . . . ." MCL 769.25(2). With a nod toward *Miller*, the statute provided that:

> (6) If the prosecuting attorney files a motion under subsection (2), the court shall conduct a hearing on the motion as part of the sentencing process. At the hearing, the trial court shall consider the factors listed in Miller v Alabama, 576 US_____; 183 L Ed 2d 407; 132 S Ct 2455 (2012), and may consider any other criteria relevant to its decision, including the individual's record while incarcerated.
>
> (7) At the hearing under subsection (6), the court shall specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed. The court may consider evidence presented at trial together with any evidence presented at the sentencing hearing. [MCL 769.25(6)-(7).]

However, absent a motion by the prosecutor seeking the penalty of life without parole, see MCL 769.25(4), or "[i]f the court decides not to sentence the individual to imprisonment for life without parole eligibility, the court shall sentence the individual to a term of imprisonment for which the maximum term shall be not less than 60 years and the minimum term shall be not less than 25 years or more than 40 years[,]" MCL 769.25(9).

## C. *APPRENDI* AND SIXTH AMENDMENT JURISPRUDENCE

### 1. *APPRENDI*

The issue at the heart of this conflict case is whether *Miller*, and how our Legislature has chosen to implement *Miller*'s guarantee of individualized sentencing in MCL 769.25, runs afoul of Sixth Amendment caselaw concerning the right to have a jury decide facts that increase the maximum available punishment. Neither *Miller* nor *Montgomery* had occasion to address this issue. In *People v Carp*, 496 Mich 440, 490-491, 491 n 20; 852 NW2d 801 (2014)—a pre-*Montgomery* case dealing with the retroactivity of *Miller*—our Supreme Court declined to address the issue. Accordingly, we must turn our attention to pertinent Sixth Amendment caselaw.

In one of the more influential cases in this line of precedent, *Apprendi v New Jersey*, 530 US 466, 490; 120 S Ct 2348; 147 L Ed 2d 435 (2000), the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *Apprendi*, the defendant pleaded guilty to a weapons offense for which the proscribed penalty was 5 to 10 years' imprisonment. *Id*. at 469-470. Subsequent to the trial court accepting the plea, the prosecutor filed a motion to extend the term of imprisonment based on a "hate crime" statute. *Id*. at 470. The trial court found that the defendant acted "with a purpose to intimidate" under the statute, which authorized the court to enhance the defendant's maximum sentence to 10-20 years' imprisonment. *Id*. at 471.

The Supreme Court agreed with the defendant's challenge to his sentence in *Apprendi*, finding that the Fourteenth Amendment's due process guarantee, as well as the Sixth Amendment right to a jury trial, "indisputably entitle a criminal defendant to a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Id*. at 477 (citation and quotation marks omitted; alteration in original). A fact, other than a prior conviction, that increased the maximum penalty beyond what was authorized by the jury's verdict, was in essence, an element that needed to be proved to the jury beyond a reasonable doubt. *Id*. at 490.

While the *Apprendi* Court held that elements of the offense must be submitted to the jury, it was careful, however, to specify that the holding in that case did not suggest

> that it is impermissible for judges to exercise discretion-taking into consideration various factors relating both to offense and offender-in imposing a judgment *within the range* prescribed by statute. We have often noted that judges in this country have long exercised discretion of this nature in imposing sentence *within statutory limits* in the individual case. [*Id*. at 481.]

Provided that a sentencing judge operated within the limits of punishment as provided by statute and did not increase the maximum punishment, the judge properly exercised his or her sentencing authority. See *id*. at 482-483. In such an instance, any facts found function as mere sentencing factors, rather than elements of an aggravated offense. See *id*. at 482-483, 485-486. See also LaFave, et al, Criminal Procedure (4th ed), § 26.4(h), p 1007.

The *Apprendi* Court also took care to note the historical difference in its jurisprudence "between facts in aggravation of punishment and facts in mitigation." *Apprendi*, 530 US at 490 n 16. The former requires a jury finding beyond a reasonable doubt, while the latter does not. *Id*. As to mitigating factors, the Court explained:

> If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone. Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme. [*Id*.]

## 2. EXPANSION OF *APPRENDI*

In the years since it issued *Apprendi*, the Supreme Court has expanded the territorial limits of "*Apprendi*-land"—a term coined by Justice Scalia[4]—to include, among other matters, judicial factfinding on aggravating factors required for the imposition of the death penalty, *Ring v Arizona*, 536 US 584; 122 S Ct 2428; 153 L Ed 2d 556 (2002), judicial factfinding that affected sentencing-guideline range maximums, see *United States v Booker*, 543 US 220; 125 S Ct 738; 160 L Ed 2d 621 (2005); *Blakely v Washington*, 542 US 296; 124 S Ct 2531; 159 L Ed 2d 403 (2004), determinate sentencing tiers pursuant to which the trial judge, not the jury, was given authority to find facts that exposed a defendant to an elevated sentence, see *Cunningham v California*, 549 US 270; 127 S Ct 856; 166 L Ed 2d 856 (2007), mandatory minimum sentences, see *Alleyne v United States*, __ US __; 133 S Ct 2151; 186 L Ed 2d 314 (2013);[5] and criminal fines, *Southern Union Co v United States*, __ US __; 132 S Ct 2344; 183 L Ed 2d 318 (2012). In each of these cases, the Court reiterated that any fact, other than a prior conviction, that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. See, e.g., *Blakley*, 542 US at 301. For purposes of *Apprendi*, this statutory maximum "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id*. at 303-304. It does not matter for purposes of *Apprendi* whether the enhancement of the maximum sentence occurs based on the finding of a single, specified fact, based on several specified facts, or based on any aggravating fact: the Sixth Amendment violation is the same regardless. *Id*. at 305. Hence, if a statute provides for a particular term of imprisonment as well as an enhanced term, a judge cannot, when the jury's verdict only authorized the lower term, find facts that increase the

---

[4] See *Ring v Arizona*, 536 US 584; 122 S Ct 2428; 153 L Ed 2d 556 (2002) (SCALIA, J., concurring).

[5] In response to *Alleyne*, our Supreme Court struck the statutory requirement in Michigan that made the use of sentencing guidelines—used to calculate a defendant's minimum sentence—mandatory. *People v Lockridge*, 498 Mich 358, 364; 870 NW2d 502 (2015).

maximum punishment. *Cunningham*, 549 US at 288. A defendant has the right to have a "jury find the existence of any particular fact that the law makes essential to his punishment." *Booker*, 543 US at 232 (citation and quotation marks omitted). The Court has repeatedly stressed that a "judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended." *Blakely*, 542 US at 306.

The Supreme Court's Sixth Amendment jurisprudence has emphasized that the *Apprendi* rule was not concerned with the label—element or sentencing factor—assigned to a particular factual finding. Rather, it was the *effect* of the particular finding that mattered. That is, did the fact or facts found by the sentencing judge increase the statutory maximum from that which was authorized by the jury's verdict? *Booker*, 543 US at 231; *Blakely*, 542 US at 306; *Apprendi*, 530 US at 494. See also *Alleyne*, 133 S Ct at 2158 ("The touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an 'element' or 'ingredient' of the charged offense. . . . a fact is by definition an element of the offense and must be submitted to the jury if it increases the punishment above what is otherwise legally prescribed."); *Cunningham*, 549 US at 290 ("If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer sentence, the Sixth Amendment requirement is not satisfied."). A particular fact functions as an "element" if by law, it increases the penalty for a crime. *Alleyne*, 133 S Ct at 2155.

### 3. *HURST* AND *RING*

In addition to the above-noted extensions of *Apprendi*, we note an area of caselaw to which the parties pay particular attention in the instant case: the extension of the *Apprendi* rule to cases involving aggravating factors used to enhance a sentence for purposes of imposing the death penalty. See *Hurst v Florida*, __ US __; 136 S Ct 616; 193 L Ed 2d 504 (2016); *Ring*, 536 US 584. Although these cases dealt with the imposition of the death penalty on adult offenders, the sentencing scheme—and the intersection of Eighth Amendment considerations and Sixth Amendment jury entitlements at issue in both *Hurst* and *Ring*—provide useful analysis for the sentencing scheme at issue in the instant case.

In *Ring*, 536 US at 591, the jury convicted the defendant, Timothy Ring, of felony murder for the death of the victim during an armored car robbery, but deadlocked on premeditated murder. The issue in that case concerned whether the jury's verdict authorized the imposition of the death penalty under Arizona law. "Under Arizona law, [the defendant] could not be sentenced to death, the statutory maximum penalty for first-degree murder, *unless further findings were made*." *Id.* at 592 (emphasis added). In particular, Arizona's first-degree murder statute authorized the penalty of death or life imprisonment, but, for purposes of determining which penalty to impose, Arizona law directed the trial judge to "conduct a separate sentencing hearing to determine the existence or nonexistence of [certain enumerated] circumstances . . . ." *Id.* (citation and quotation marks omitted). The sentencing scheme at issue went on to provide that the trial judge was to determine whether any of the enumerated aggravating factors existed, as well as any mitigating circumstances, and the judge could only impose the death penalty "if there is at least one aggravating circumstance and there are no mitigating circumstances sufficiently substantial to call for leniency." *Id.* at 593 (citation and quotation marks omitted).

The defendant in *Ring* contended that the Sixth Amendment required jury findings on the statutory aggravating factors. *Id*. at 597 n 4. The "aggravating" factors required by Arizona law were added by the state's legislature in large part due to Eighth Amendment caselaw concerning the imposition of death sentences and the requirement of aggravating factors. *Id*. at 606, citing *Maynard v Cartwright*, 486 US 356, 362; 108 S Ct 1853; 100 L Ed 2d 372 (1988); *Furman v Georgia*, 408 US 238; 92 S Ct 2726; 33 L Ed 2d 346 (1972). The Supreme Court in *Ring* remarked that the addition of aggravating factors was an "element" which was "constitutionally required" by the Eighth Amendment. *Ring*, 536 US at 607.

The Supreme Court found that Arizona's sentencing scheme could not be reconciled with the rule from *Apprendi* because "[b]ased solely on the jury's verdict finding [the defendant] guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment[,]" not death. *Id*. at 597. See also *id*. at 609 (holding that the Arizona sentencing scheme violated the Sixth Amendment because it "allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty."). "This was so because, in Arizona, a death sentence may not be legally imposed" under state law, "*unless* at least one aggravating factor is found to exist beyond a reasonable doubt." *Id*. at 597 (citation and quotation marks omitted; emphasis added). Reviewing *Apprendi*, the Court stated that the "dispositive question" was " 'one not of form, but of effect.' If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Id*. at 602, quoting *Apprendi*, 530 US at 494. In *Ring*, the "effect" of the statutory scheme required the finding of an aggravating fact *before* a defendant could be exposed to a greater punishment—death—than was authorized by the jury's verdict alone. *Ring*, 536 US at 604. "Because Arizona's enumerated aggravating factors operate as the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury." *Id*. at 609 (citation and quotation marks omitted).

In *Hurst*, another case dealing with the imposition of the death penalty, the Court dealt with a variation on the issue raised in *Ring*. In that case, the defendant, Timothy Hurst, was convicted of first-degree murder. *Id*. at 619-620. Under Florida law, the maximum sentence that could be imposed for the offense was life imprisonment. *Id*. at 620. An offender could only receive a death sentence based on additional findings of fact. *Id*. The sentencing proceeding at issue was one in which a jury rendered an "advisory verdict" without specifying the factual basis for its recommendation. *Id*. Afterwards, the trial judge was to weigh aggravating and mitigating factors and to decide between a sentence of life imprisonment or death. *Id*. Further, "[i]f the court imposes death, it must set forth in writing its findings upon which the sentence of death is based." *Id*. (citation and quotation marks omitted).

The United States Supreme Court concluded that Florida's sentencing scheme could not be reconciled with *Ring* and *Apprendi*. *Id*. at 621. The Court recited its holding in *Ring* that "Arizona's capital sentencing scheme violated *Apprendi*'s rule because the State allowed a judge to find the facts necessary to sentence a defendant to death." *Id*., citing *Ring*, 536 US at 591. This same analysis, the Court concluded, applied in *Hurst* and demonstrated the constitutional infirmity of the defendant's death sentence in that case. *Hurst*, 136 S Ct at 621-622. "Like Arizona at the time of *Ring*, Florida does not require the jury to make the critical findings *necessary to impose the death penalty*. Rather, Florida requires a judge to find these facts." *Id*.

at 622 (emphasis added). That Florida's sentencing scheme included an advisory jury verdict—a component not present in Arizona's scheme—did not change the analysis because the advisory jury did not make specific factual findings and its recommendation was not binding on the judge. *Id*. Hence:

> As with Timothy Ring, the maximum punishment Timothy Hurst could have received without any judge-made findings was life in prison without parole. As with Ring, a judge increased Hurst's authorized punishment based on her own factfinding. In light of *Ring*, we hold that Hurst's sentence violates the Sixth Amendment. [*Id*.]

In short, the Sixth Amendment violation in *Hurst*, as it was in *Ring*, was that, although the statutory maximum for the homicide offense of which the defendant was convicted authorized the death penalty, a judge could only impose the death penalty based on findings beyond the jury's verdict. The death penalty was not available but for factual findings on aggravating factors that had not been submitted to a jury for determination beyond a reasonable doubt.

### 4. *APPRENDI* DOES NOT BAR ALL JUDICIAL FACTFINDING

For all that was said in *Apprendi* and its progeny, we note that the Supreme Court's holding in those cases must not be read as a prohibition against all judicial factfinding at sentencing. Indeed, the rules from *Apprendi* and its progeny do not stand for the proposition that a sentencing scheme in which judges are permitted "genuinely to exercise broad discretion . . . *within a statutory range*" is unconstitutional; rather, as articulated in *Cunningham*, "everyone agrees" that such a scheme "encounters no Sixth Amendment shoal." *Cunningham*, 549 US at 294 (citation and quotation marks omitted; alteration in original; emphasis added). See also *Alleyne*, 133 S Ct at 2163 ("Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment."). Thus, a judge, acting with the range of punishment authorized by statute, may exercise his or her discretion—and find facts and consider factors relating to the offense and the offender—without violating the Sixth Amendment. *Id*., citing *Apprendi*, 530 US at 481. As explained in *Alleyne*, 133 S Ct at 2163:

> [W]ithin the limits of any discretion as to the punishment which the law may have allowed, the judge, when he pronounces sentence, may suffer his discretion to be influenced by matter shown in aggravation or mitigation, not covered by the allegations of the indictment." [1 J. Bishop, Criminal Procedure 50 (2d ed, 1872), § 85, at 54.]

> "[E]stablishing what punishment is available by law and setting a specific punishment within the bounds that the law has prescribed are two different things." *Apprendi*, *supra*, at 519, 120 S Ct 2348 (THOMAS, J., concurring).

### D. *SKINNER* AND *HYATT*

With that backdrop in mind, we arrive at the basis for this conflict: *Skinner* and the prior opinion in this case.

## 1. *SKINNER*

This Court first encountered the issue in *Skinner*, where the majority, after a careful and detailed discussion of the relevant caselaw, arrived at the conclusion that a jury is to be the decision maker at the so-called *Miller* hearing required by MCL 769.25. The majority concluded that MCL 769.25 mandated "findings" and that those findings constituted elements of the offense. *Skinner*, 312 Mich App at 42-43. The majority reasoned that MCL 769.25 established a "default" sentence of a term of years for juveniles convicted of first-degree murder because, absent a motion by the prosecution, the trial court was required to impose a term-of-years sentence. *Id*. at 43-44, citing MCL 769.25(4). This conclusion as to a "default" sentence was premised, in part, on our Supreme Court's opinion in *Carp*, which used the same term, "default," and concluded that "MCL 769.25 now establishes a default sentencing range for individuals who commit first-degree murder before turning 18 years of age." *Skinner*, 312 Mich App at 44, quoting *Carp*, 496 Mich at 458. According to the majority in *Skinner*, MCL 769.25 conditioned a life-without-parole sentence for a juvenile offender on two things: (1) the filing of a motion by the prosecution; and (2) the trial court's findings on the *Miller* factors and on other criteria as provided in MCL 759.25(6). *Skinner*, 312 Mich App at 45. This, according to the majority, was a scheme that authorized an *enhanced sentence* based on factual findings by the trial court, and ran afoul of the rule established in *Apprendi* and its progeny. *Id*.

> Clearly, the findings mandated by MCL 769.25(6) "expose the defendant to a greater punishment than that authorized by the jury's guilty verdict," *Apprendi*, 530 US at 494; 120 S Ct 2348, and therefore act as the "functional equivalent" of elements of a greater offense that must be proved to a jury beyond a reasonable doubt, *Ring*, 536 US at 609; 122 S Ct 2428. An enhanced punishment under MCL 769.25 is not based merely on defendant's prior convictions, on facts admitted by defendant, or on facts that are part and parcel of the elements that were submitted to the jury during the guilt-phase of the proceeding. Rather, like in *Apprendi*, 530 US at 476; 120 S Ct 2348, in this case the state threatened defendant with certain pains—i.e., a term-of-years sentence—following her jury conviction of first-degree murder and with additional pains—i.e., life without parole—following additional findings by the trial court. "Merely using the label 'sentence enhancement' to describe the latter surely does not provide a principled basis for treating them differently." *Id*. The effect of MCL 769.25 plainly subjects defendant to harsher punishment on the basis of judicially found facts in contravention of the Sixth Amendment. [*Skinner*, 312 Mich App at 46.]

In a strong dissent, Judge Sawyer rejected the idea that MCL 769.25 required findings of fact that increased the maximum sentence authorized by statute. *Skinner*, 312 Mich App at 63 (SAWYER, J., dissenting). Judge Sawyer equated the requirements of MCL 769.25 to sentencing factors, rather than factfinding that authorized the trial court to impose a greater sentence than the statutory maximum. *Id*. at 63-64. "[T]he juvenile lifer law does not require any particular judicial fact-finding to increase the potential sentence from a term of years to life without parole." *Id*. at 70. MCL 769.25, as summarized by Judge Sawyer:

. . . does require the trial court to conduct a hearing before it may impose a sentence of life without parole on a juvenile offender. And it further requires that the trial court "consider" the factors listed in *Miller*, as well as any other criteria the trial court deems relevant to its decision. MCL 769.25(7) then requires that "the court shall specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed." *But nowhere does the statute require the trial court to make any particular finding of fact before it is authorized to impose a sentence of life without parole. Rather, after conducting the hearing and considering the evidence presented at the hearing as well as the evidence presented at trial, the trial court makes its decision and must state on the record the reasons for that decision.* As our Supreme Court noted in *Carp*, this process allows for the "individualized sentencing" procedures established by *Miller*. This procedure also presumably allows for more meaningful appellate review of the sentence. [*Skinner*, 312 Mich App at 73 (SAWYER, J., dissenting) (citation omitted; emphasis added).]

Likewise, Judge Sawyer concluded that *Miller* itself did not require that any particular fact be found before a court could impose a sentence of life without parole. *Id*. at 74. Rather, it merely set forth a framework for ensuring that the juvenile received an individualized sentence. *Id*.

2. *HYATT*

In the prior appeal in the instant matter, defendant Hyatt argued that he was entitled to have a jury determine his sentence in accordance with *Skinner*. The panel recognized that it was bound by *Skinner*, but stated "we believe that *Skinner* was wrongly decided." *Perkins*, __ Mich App at __; slip op at 14. Like the panel in *Skinner*, the prior panel engaged in a lengthy and detailed analysis of MCL 769.25, *Miller*, and Sixth Amendment caselaw such as *Apprendi*, *Ring*, *Booker*, *Blakely*, *Cunningham*, and *Alleyne*. *Id*. at 14-21. After this detailed analysis, the panel agreed with Judge Sawyer's dissent in *Skinner*. That is, the prior panel believed that MCL 769.25 "does not run afoul of [Sixth Amendment jurisprudence] because Hyatt did not receive an enhanced sentence. The sentencing court did not determine facts not already determined by the jury's verdict." *Id*. at 21. Moreover, unlike in *Apprendi*, *Ring*, *Blakely*, *Cunningham*, and *Alleyne*, "nothing in MCL 769.25 premised the sentencing court's authority to impose a term of life imprisonment without parole on any specific finding that Hyatt's jury failed to consider in convicting Hyatt of first-degree felony murder. Because the prosecutor undisputedly and properly filed a motion seeking a life-without-parole sentence for Hyatt, the term of years mandate in §§ 25(4) and (9) did not apply." *Id*. Finally, reasoned the panel, "the plain language of the statute did not require the trial court to make any findings concerning aggravating or mitigating factors before the court could sentence Hyatt to life without parole. Consequently, the life without parole sentence in this case came within the statutory maximum . . . ." *Id*. at 22.

The prior panel remanded the matter for resentencing, but stated that, "[w]ere it not for *Skinner*, we would affirm the sentencing court's decision to sentence Hyatt to life imprisonment without the possibility of parole." *Id*. at 22-23.

-12-

## E.  RESOLUTION OF THE CONFLICT

We hold that the prior panel in this case reached the correct result.  Neither *Miller* nor MCL 769.25 implicates the right to a jury trial under *Apprendi* and its progeny.  Rather, our Legislature's implementation of *Miller*'s Eighth Amendment protections through MCL 769.25 simply establishes a procedural framework for protecting a juvenile's Eighth Amendment rights at sentencing.  The sentencing procedure at issue in this case does not involve the concern at issue in *Apprendi*, 530 US at 490, of factfinding that increases the maximum penalty for juvenile homicide offenders.  The instant case is not one in which the finding of a particular fact increases the maximum penalty.  Nor does the instant case involve a statutory scheme that makes the imposition of life without parole contingent on any particular finding.  Under MCL 769.25, the statutory maximum for juvenile offenders—assuming the requisite motion has been filed—is a life-without-parole sentence, and the sentencing authority, in imposing that rare sentence, is not tasked with finding any particular fact before arriving at such a sentence.  A careful examination of both *Miller* and MCL 769.25 compels this result.

At the outset, we reject arguments that the Supreme Court's decision in *Miller* can be read to implicate the Sixth Amendment; we also reject the idea that the decision in *Miller* suggests the right to have a jury determination on the sentence of life without parole.  In this respect, it is important to note the Court's concern in *Miller*.  In *Miller*, the Court was concerned with the imposition of a disproportionate sentence on juvenile offenders.  The risk of a disproportionate sentence was, for purposes of the Eighth Amendment, unacceptable under a system of mandatory life-without-parole sentences for certain homicide offenses.  *Miller*, 132 S Ct at 2469 ("By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment.").  To alleviate this concern, the Court created a framework for protecting a juvenile's Eighth Amendment right against disproportionate punishment.  Important to our present case, this framework does not make the imposition of a life-without-parole sentence contingent upon the finding of a certain fact.  The Court's decision in *Miller* did not require a sentencing authority to consider an offender's youth before *aggravating* the available penalty.  Rather, the Court imposed an individualized sentencing mandate for juvenile offenders convicted of homicide offenses.  Individualized sentencing was required to ensure proportionality, not to aggravate the maximum penalty available under the law.  Hence, a sentencing authority remains free, under *Miller*, to impose a life-without-parole sentence based solely on the jury's verdict.  *Miller* simply holds that a framework of protections required by the Eighth Amendment must be implemented in order to ensure that the imposition of the maximum available penalty—life without parole—is proportionate to the particular offender and the particular offense.  In short, the remodeling that *Miller* performed on life-without-parole sentences for juveniles did not touch the ceiling—or floor, for that matter—of the available sentence for juvenile homicide offenders.

In support of our interpretation of *Miller*'s demands, we note the Supreme Court's discussion of *Miller* in *Montgomery*.[6]  Notably, in *Montgomery*, 136 S Ct at 735, albeit not

---

[6] Again, neither the panel in *Skinner* nor the prior panel in this case had the benefit of *Montgomery*'s analysis.

within the context of a Sixth Amendment discussion, the Supreme Court expressly recognized that its decision in *Miller* did not require a sentencing authority to make a finding of fact on a child's incorrigibility before imposing a life-without-parole sentence. As stated in *Montgomery*, "[t]hat *Miller* did not impose a formal factfinding requirement [regarding incorrigibility] does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole. To the contrary, *Miller* established that this punishment is disproportionate under the Eighth Amendment." *Id.* In accordance with *Montgomery*'s conclusion about *Miller*'s demands, we decline to find anything in *Miller* that implicates a defendant's Sixth Amendment rights.[7]

This is not to say that the sentencing procedure envisioned by *Miller* does not involve *any* factfinding.[8] However, the procedure described by *Miller* is missing key components for purposes of *Apprendi* and its progeny: nowhere in *Miller*'s individualized sentencing mandate is the idea that *Miller* altered the maximum punishment available for juvenile offenders or made the imposition of any punishment contingent on factfinding. In other words, the Court did not hold that a life-without-parole sentence was unavailable *unless* the sentencing authority found certain facts. In this sense, *Miller* did not impose any aggravating factors such as those that were at issue in *Ring*, 536 US at 591-592, where, under Arizona law, which was enacted in response to Eighth Amendment precedent, the jury's verdict alone was insufficient to authorize capital punishment and a death sentence required additional findings on certain aggravating factors. Contrastingly, *Miller* merely provided certain considerations that must be taken into account by a sentencing authority when imposing the maximum sentence—life without parole—in order to protect a juvenile's Eighth Amendment right against a disproportionate, non-individualized sentence.

---

[7] Although they are not binding on this Court, we note that two of the only cases to consider this issue in another state reached the same result regarding whether *Miller* requires a jury determination. See *State v Fletcher*, 149 So3d 934, 943 (La Ct App, 2014); *People v Gutierrez*, unpublished opinion of the California Court of Appeal, issued June 22, 2016 (Docket No. B261989), p 6-7. Notably, in *Fletcher*, 149 So3d at 943, the Louisiana Court of Appeals rejected the idea that *Miller* created a "new statutory maximum" for purposes of *Apprendi*; further, *Fletcher* rejected the idea that *Miller* required proof of an additional element before a sentencing authority could impose a life-without parole sentence. Rather, reasoned the Court in *Fletcher*, *Miller* "merely mandates a hearing at which youth-related mitigating factors can be presented to the sentencer and considered in making a determination of whether the life sentence imposed upon a juvenile killer should be with or without parole eligibility." *Id.*

[8] For instance, *Miller* requires a hearing at which a court can receive evidence about, among other matters, the circumstances of the homicide offense, including the juvenile's role in the offense. *Miller*, 132 S Ct at 2468. Such a hearing will almost inevitably produce conflicting evidence about the extent of the offender's role, with the prosecution likely seeking to maximize the juvenile defendant's involvement in the homicide and the juvenile defendant seeking to minimize that role. A sentencing judge tasked with weighing the offender's role in the offense, when faced with conflicting evidence, will necessarily have to make a determination about which evidence to believe, i.e., a factual finding.

Hence, *Miller* does not implicate the type of factfinding prohibited by *Apprendi*. The process described in *Miller* was merely a means of ensuring that the maximum sentence available under the law—life without parole—was proportionate to *the particular offender* at issue. The considerations required by *Miller*'s individualized sentencing guarantee are sentencing factors, not elements that must be found before a more severe punishment is authorized. See *Apprendi*, 530 US at 482-483, 485-486. As succinctly stated in *Alleyne*, 133 S Ct at 2163, Sixth Amendment jurisprudence has "recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment."[9]

However, the conclusion that *Miller* does not require certain factual findings in order to impose upon a juvenile offender a sentence of life without parole is not, by itself, dispositive of the issue raised. As the Supreme Court in *Montgomery* acknowledged, the implementation of *Miller*'s directives was a matter left largely to the states. *Montgomery*, 136 US at 735. We now turn to the legislative response at issue in this case, MCL 769.25, in order to determine if the right to a jury determination can be found therein.

Careful examination of MCL 769.25 reveals that our Legislature did not alter the statutory maximum sentence that may be imposed based solely on the jury's verdict, nor did our Legislature make the imposition of the statutory maximum dependent on any particular finding of fact. The statute provides that, in order to sentence a juvenile defendant to life without parole, the prosecution must, in a case involving an enumerated homicide offense, file the requisite motion within the specified time period. MCL 769.25(2)-(3). If the prosecuting attorney files this motion, the trial court "shall conduct a hearing on the motion as part of the sentencing process." MCL 769.25(6). At the hearing, the trial court is to consider "the factors listed in Miller v Alabama . . . and may consider any other criteria relevant to its decision, including the individual's record while incarcerated." MCL 769.25(6). Then, in what would appear to be an effort to aid appellate review of the sentence, the trial court, "shall specify on the record the aggravating and mitigating circumstances considered by the court and the court's reasons supporting the sentence imposed. The court may consider evidence presented at trial together with any evidence presented at the sentencing hearing." MCL 769.25(7).

In sum, MCL 796.25 does two important things. As an initial matter, the statute plainly states that the statutory maximum for the enumerated homicide offenses, in the event the prosecution files the requisite motion, is life without parole. Any contention that MCL 769.25

---

[9] We briefly note Justice Breyer's concurring opinion in *Miller*, in which he takes the view that, in order to impose a life-without-parole sentence on a juvenile offender, there must be a finding that the offender killed or intended to kill. *Miller*, 132 S Ct at 2475 (BREYER, J., concurring). A life-without-parole sentence should be, according to Justice Breyer, "forbid[den]" without such a finding. *Id*. If this view were the current state of the law, it might change our Sixth Amendment analysis, particularly in this case, which involved felony murder in a multiple-offender situation. However, Justice Breyer's view was not adopted by the majority in *Miller*, and we see no Sixth Amendment implications in the majority's decision in *Miller*.

creates a "default"[10] sentence of a term of years in all instances ignores the plain language of the statute. MCL 769.25(2) plainly permits the prosecution to seek life without parole upon the filing of the requisite motion. Once this motion is filed, the statutory maximum is life without parole, and the trial court has discretion whether to sentence up to that statutory maximum.

This leads to our second point. MCL 769.25 does not make the imposition of this statutory maximum contingent on any particular fact. Rather, the statute mirrors what is required by *Miller*—individualized sentencing. That is, MCL 769.25 does away with mandatory life-without-parole sentences and requires the trial court, when the maximum sentence is sought, to make the individualized sentencing determination required by *Miller*. If, consistent with *Miller*'s demands, the sentencing judge deems life without parole to be appropriate—meaning that the case before it is one of the rare cases described by *Miller*—the trial court is authorized by the jury's verdict to impose a life-without-parole sentence. Indeed, as is the case with *Miller*, our statutory scheme does not *require* any additional findings before the imposition of a life-without-parole sentence is warranted. The sentencing judge decides whether to exercise her discretion to impose that statutory maximum by considering the so-called *Miller* factors in order to satisfy *Miller*'s individualized sentencing mandate. In sum, in the case where the prosecution files the requisite motion, the " 'statutory maximum' for *Apprendi* purposes" see *Blakely*, 542 US at 303, is life without parole. This sentence, then, is permitted "*solely on the basis of the facts reflected in the jury verdict . . . .*" *Id*. This type of sentencing scheme does not run afoul of *Apprendi* and its progeny.

In this sense, the sentencing scheme imposed by MCL 769.25 is different from the schemes at issue in cases such as *Apprendi*, *Blakely*, *Booker*, and *Cunningham*—and that difference is of critical importance for purposes of the Sixth Amendment inquiry. In particular, we note that in *Apprendi*, 530 US at 470, the potential of an enhanced sentence was based, in part, upon the prosecution's filing of a motion for such a sentence upon the finding that the defendant acted with a biased purpose—which was a fact not encompassed by the jury's verdict. Here, by contrast, the prosecution files a motion to sentence up to the maximum *as allowed by the jury's* verdict. The filing of the prosecution's motion in the instant case is not meant to trigger a factual finding that will increase the maximum sentence; instead, the motion is filed to initiate the Eighth Amendment protections demanded by *Miller*.

It is argued that a sentencing judge will necessarily engage in factual finding during the *Miller* analysis. On this point, we agree. However, as noted above, that a sentencing judge makes factual findings is not dispositive. The dispositive question is whether the statute authorizes *increased punishment*, contingent on certain factual findings. *Ring*, 536 US at 602. Indeed, "[a] statutory requirement that a judge make findings, however, does not mean that any

---

[10] The suggestion that our Supreme Court in *Carp*, 496 Mich at 458, declared that MCL 769.25 created a "default" sentence of a term of years in all instances is inaccurate. Although *Carp* mentioned a default sentence, it did so in describing the procedure for sentencing a juvenile *in the absence of a motion filed by the prosecution* seeking a life-without-parole sentence. *Id*. at 458.

specific finding is necessary for imposition of the sentence." *State v Fell*, 210 Ariz 554, 559; 115 P3d 594 (2005).[11] MCL 769.25 does not authorize increased punishment, much less make such an increase contingent on any facts. Instead, the factfinding that will inevitably occur during the *Miller* analysis is the kind which, as stated in *Cunningham*, "everyone agrees encounters no Sixth Amendment shoal." *Cunningham*, 549 US at 294 (citation and quotation marks omitted). See also *Alleyne*, 133 S Ct at 2163 ("Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment."). Any factfinding that occurs "do[es] not pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned." *Blakely*, 542 US at 309.

As a comparison, we turn to the sentencing of criminal defendants by federal district courts and note the type of judicial factfinding that occurs under the sentencing factors listed in 18 USC 3553(a).[12] Any finding of facts that occurs with regard to the statutory factors is meant "to inform individual sentencing decisions and to help meet the Sentencing Commission's twin-goals of sentencing—uniformity and proportionality," and does not affect the maximum sentence that may be imposed. *United States v Ali*, 508 F3d 136, 146 n 15 (CA 3, 2007). Like the federal sentencing guidelines post-*Booker*, there is no mandatory or default sentence under MCL 769.25 that must be imposed *unless* the sentencing judge finds facts that the jury never found nor were admitted by the defendant. As noted by the United States Supreme Court in *Rita v United States*, 551 US 338, 352; 127 S Ct 2456; 168 L Ed 2d 203 (2007), "[t]his Court's Sixth Amendment cases do not automatically forbid a sentencing court to take account of factual matters not determined by a jury and to increase the sentence in consequence." Rather, "[t]he Sixth Amendment question" concerns "whether the law *forbids* a judge to increase a defendant's

---

[11] Although decisions from other states are not binding, we may consider them as persuasive authority. *People v Jackson*, 292 Mich App 583, 595 n 3; 808 NW2d 541 (2011).

[12] Pursuant to 18 USC 3553(a), "[t]he court, in determining the particular sentence to be imposed, shall consider—

    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford an adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner[.]"

sentence *unless* the judge finds facts that the jury did not find (and the offender did not concede)." *Id*.

We also reject any argument that the instant case is comparable to the sentencing scheme that was at issue in *Ring*, 536 US 584, a case cited heavily by the parties. In *Ring*, the statutory scheme at issue stated that the maximum penalty was death or life imprisonment, but it *conditioned* the imposition of the death penalty, which represented an increase in the authorized punishment, on further factual findings. *Id*. at 591-592. Those additional findings concerned aggravating and mitigating circumstances. *Id*. at 592. In the instant case, it is true that MCL 769.25(7) uses the term "aggravating and mitigating circumstances." The key difference, once again, is that MCL 769.25 does not make the imposition of life without parole contingent upon certain findings. MCL 769.25 only requires that which *Miller* requires—individualized sentencing based on the so-called *Miller* factors. The juvenile defendant is—based solely on the jury's verdict and the prosecution's motion—eligible for a life-without-parole sentence, the statutory maximum.

In sum, all that is mandated by MCL 769.25 is the individualized sentencing required, as stated in *Miller*, by the Eighth Amendment. The analysis on the *Miller* factors does not aggravate punishment; instead, the analysis acts as a means of *mitigating* punishment because it acts to caution the sentencing judge against imposing the maximum punishment authorized by the jury's verdict, a sentence which *Montgomery* cautioned is disproportionate for "the vast majority of juvenile offenders . . . ." *Montgomery*, 136 S Ct at 736. Indeed, unless the defendant is the rare juvenile, the *Miller* analysis, as incorporated by MCL 769.25, has the effect of mitigating the available punishment.

The idea that *Miller*—and MCL 769.25 by its incorporation of the "*Miller* factors"—sets forth a framework of mitigation, rather than aggravation, is apparent from the text of the *Miller* decision itself. See *Miller*, 132 S Ct at 2475 (emphasis added) ("our individualized sentencing decisions make clear that a judge or jury[13] *must have the opportunity to consider mitigating circumstances* before imposing the harshest possible penalty for juveniles."). Indeed, the Supreme Court's decision in *Miller* is rife with arguments concerning why juveniles are constitutionally different from adults and why these differences *diminish the culpability* of juveniles. See, e.g., *id.* at 2464 (explaining that juveniles are "constitutionally different from adults for purposes of sentencing" because, among other reasons, they have "diminished culpability"). The fault of a mandatory life-without-parole sentence, according to *Miller*, was that it failed to give the sentencing authority "the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles" and that such a

---

[13] As aptly noted by the panel in *Skinner*, 312 Mich App at 491, the "passing reference to 'a judge or jury' " in *Miller* is hardly illuminating with regard to the issue at hand. The issue before the Court in *Miller* was limited to Eighth Amendment concerns, and the Court was not called upon to weigh in on the matter now before us. Hence, like the panel in *Skinner*—and, for that matter, our Supreme Court in *Carp*, 496 Mich at 491 n 20—we assign no significance to the phrase, "judge or jury" as it is used in *Miller*.

-18-

mandatory sentencing scheme violated the principle of proportionality by forcing the sentencing authority to ignore "age and age-related characteristics . . .", i.e., those characteristics which diminish the culpability of the juvenile, thereby warranting a lesser sentence. *Id.* at 2475. The Court in *Miller* specifically invoked the "mitigating qualities of youth" in explaining why individualized sentencing was necessary for the imposition of the harshest possible penalty available for juveniles—life without parole. *Id.* at 2467 (citation and quotation marks omitted). This culminated in the Court announcing the so-called *Miller* factors, all of which speak to *mitigation* and why "chronological age and its hallmark features" should be considered when sentencing a juvenile. *Id.* at 2468. Put simply, *Miller* required individualized sentencing as a means of mitigating the maximum penalty authorized by the jury's verdict, rather than aggravating the penalty beyond that which was set forth by law.[14] So too, MCL 769.25 sets a maximum punishment—in the event the prosecution files the requisite motion—at life without parole, and mandates that the sentencing judge consider the *Miller* factors in a way that mitigates, rather than enhances, the maximum available penalty.

Viewing the *Miller* factors as a means of mitigation is not to suggest, however, that life without parole remains the default sentence for juveniles convicted of first-degree murder after *Miller*. Indeed, it is doubtful whether that result could be squared with *Miller*'s conclusions about the constitutional infirmities inherent in a mandatory life-without-parole sentencing scheme for juveniles. Instead, the *Miller* factors act as a means of mitigation in the sense that they must be considered by the sentencing judge when he or she is determining whether life without parole is an appropriate sentence to impose.

Our decision today comports with those of numerous state and lower federal courts that have considered, albeit in slightly different contexts, the intersection of the Eighth Amendment's proportionality requirements and the Sixth Amendment right to a jury trial. The cases from which we draw support stemmed from the United States Supreme Court's decisions in *Atkins v Virginia*, 536 US 304; 122 S Ct 2242; 153 L Ed 2d 335 (2002)—concluding that the Eighth Amendment barred the imposition of capital punishment on defendants who are intellectually disabled, and *Tison v Arizona*, 481 US 137; 107 S CT 1676; 95 L Ed 2d 127 (1987)—banning the imposition of the death penalty in felony-murder cases unless the defendant: (a) was a major participant in the offense; or (2) acted with at least a reckless indifference to human life. The consensus in these cases is that when the Eighth Amendment's proportionality requirement has barred the imposition of the death penalty based on a certain factor or factors that suggested diminished culpability, the determination of whether those certain factors exist is not one that is subject to a jury determination. Stated differently, the Eighth Amendment prohibitions are considered to be mitigating factors that act as a bar against imposing the statutory maximum penalty, rather than as elements that enhance the maximum possible penalty, and the determination of whether those mitigating factors exist need not, under *Apprendi* and its

---

[14] To be sure, however, *Miller* made clear that mitigation was more often than not the appropriate route, emphasizing that a life-without-parole sentence would be proportionate for only the rare juvenile "whose crime reflects irreparable corruption." *Miller*, 132 S Ct at 2469 (citation and quotation marks omitted).

progeny, be made by a jury. See, e.g., *State v Agee*, 358 Or 325, 364; 364 P3d 971 (2015) (Oregon, 2015) (holding that a determination on intellectual disability is a mitigating factor that can be made by a judge and does not, under *Apprendi* and *Ring*, require a jury determination); *State v Hill*, 177 Ohio App 3d 171, 187; 894 NE2d 108 (Ohio App, 2011) (rejecting the idea that the Eighth Amendment's prohibition on imposing the death penalty on an intellectually disabled adult required a jury determination of intellectual disability since such a determination acted to mitigate, rather than enhance, the available punishment); *Commonwealth v Bracey*, 604 Pa 459, 473-474; 986 A2d 128 (2009) (finding that there was no right to a jury trial on an *Atkins* claim under *Ring*); *State v Galindo*, 278 Neb 599, 655; 774 NW2d 190 (2009) (rejecting the idea that *Tison* findings were "elements" of the offense); *State v Nichols*, 219 Ariz 170, 172; 195 P3d 207 (2008) (recognizing that the Sixth Amendment did not require that a jury make *Tison* findings, but a state statutory scheme could require as much if the legislature so chose); *State v Johnson*, 244 SW3d 144, 151 (Mo, 2008) (holding that a finding of intellectual disability was a finding that removed the defendant from consideration for the death penalty and was therefore not the equivalent of an aggravating factor that required a jury determination under *Ring*); *State v Grell*, 212 Ariz 516, 526-527; 135 P3d 696 (2006) (discussing mitigating factors from *Atkins* and *Tison* and concluding that there is no right to a jury trial on either set of factors under *Apprendi* and its progeny); *Head v Hill*, 277 Ga 255, 258; 587 SE2d 613 (2003) (opining that because intellectual disability was an "exemption" from the death penalty, it was a mitigating factor and not "the functional equivalent of an element" of the offense); *In re Johnson*, 334 F3d 403, 405 (CA 5, 2003) (stressing that a mitigating analysis of intellectual disability—required by the Eighth Amendment, per *Atkins*—was not the functional equivalent of an element of a greater offense). See also LaFave, § 26.4(i), p 1019-1020 ("So far, lower courts have rejected arguments to equate the factors which as a matter of Eighth Amendment law are required for death eligibility with elements. The rules in *Tison* and *Atkins* have instead been treated as defenses to, not elements of, capital murder.").[15]

---

[15] The United States Supreme Court has denied leave in some of these cases, see, e.g., *Galindo v Nebraska*, 559 US 1010; 130 S Ct 1887; 176 L Ed 2d 372 (2010), but has yet to expressly weigh in on the issue, post-*Apprendi*. With regard to the *Atkins* line of cases, the United States Supreme Court in *Schriro v Smith*, 546 US 6, 7; 126 S Ct 7; 163 L Ed 2d 6 (2005), left to the states to determine how to implement *Atkins* and to decide whether a judge or jury should weigh in on the mitigating factor of intellectual disability. We also note that with regard to the offender's role in the offense, the Supreme Court in *Cabana v Bullock*, 474 US 376; 106 S Ct 689; 88 L Ed 2d 704 (1986), abrogated in part on other grounds *Pope v Illinois*, 481 US 497, 503 n 7; 107 S Ct 1918; 95 L Ed 2d 439 (1987), discussed *Enmund v Florida*, 458 US 782; 102 S Ct 3368; 73 L Ed 2d 1140 (1982), a case which served as a precursor to *Tison* and which drew similar conclusions about the Eighth Amendment's concern with the offender's role in a capital offense. Pertinent to our discussion, the Supreme Court in *Cabana* held that the offender's role in the offense did not concern guilt or innocence and did not establish an element of capital murder that had to be found by a jury. *Cabana*, 474 US at 385. Rather, the determination of the offender's role, for purposes of the Eighth Amendment, was a consideration of proportionality under the Eighth Amendment, and was not a decision that required a jury determination. Accordingly, to the extent the Supreme Court has weighed in on this issue, it has determined that

-20-

These cases are instructive in the instant case. Although the Court's holding in *Miller* did not produce an outright ban on the imposition of life-without-parole sentences for juvenile homicide offenders, it nevertheless declared that in the "vast majority" of cases, such a sentence will be disproportionate under the Eighth Amendment. Similar to the proportionality analysis of *Atkins* and *Tison*, the Supreme Court in *Miller* concluded that a certain characteristic of the offender rendered the maximum punishment authorized by statute to be disproportionate because that characteristic suggested diminished culpability on the part of the offender. And, as in *Atkins* and *Tison*, the Supreme Court in *Miller* recognized that the Eighth Amendment required that a certain framework of protections needed to be considered before the maximum punishment authorized by statute could be imposed. Thus, the decision in *Miller* demonstrates that a juvenile offender's age is a mitigating factor that is to be considered in rendering a proportionate sentence for a juvenile who is convicted of first-degree murder.[16] Our Legislature enacted MCL 769.25 in a way that essentially mirrored that which is required by *Miller*. Consideration of the *Miller* factors under MCL 769.25 acts to mitigate punishment, rather than acting as the functional equivalent of an element of a greater offense.

## F. CONCLUSION

In sum, we find that *Miller*'s individualized sentencing mandate, as incorporated by MCL 769.25, does not run afoul of Sixth Amendment precedent. A judge, not a jury, is to make the determination of whether to impose a life-without-parole sentence or a term-of-years sentence under MCL 769.25. Accordingly, we reject the result reached in *Skinner* and conclude that the prior panel in this case was correct in its analysis.

## IV. APPLICATION TO THIS CASE

As for the outcome of the case before us, the prosecution asks that we do two things: (1) affirm the life-without-parole sentence imposed on defendant Hyatt; and (2) articulate the appropriate standard of review on appeal for a juvenile life-without-parole sentence. In addressing these issues we find it necessary to adhere to and incorporate *Miller* and *Montgomery*'s oft-repeated warnings about how rare life-without-parole sentences for juvenile offenders will be proportionate.

---

a finding on mitigating factors does not implicate the right to a jury trial. However, before we place too much stock in *Cabana*, we must note that the case was decided prior to *Apprendi*. Accordingly, we place greater emphasis on the state court and lower federal court decisions noted above.

[16] Accordingly, we caution that the filing of a motion seeking a life-without-parole sentence under MCL 769.25(2) and the resultant *Miller* hearing is not to be treated as but a perfunctory exercise that will authorize the imposition of a life-without-parole sentence. Such an approach defies what was first announced in *Miller* and made even clearer in *Montgomery*: life-without-parole is to be imposed on juvenile offenders in only the rarest of cases.

## A. THE TRULY RARE JUVENILE

As noted, *Miller* stopped shy of—and did not expressly consider—imposing a categorical ban on life-without-parole sentences for juveniles, but the Supreme Court repeatedly admonished sentencing authorities to impose the penalty of life without parole in only the rarest of circumstances, given the many mitigating factors of youth. In this regard, we note the concerns raised in *Miller*—and *Roper* and *Graham* for that matter—concerning how juveniles are different from adults in terms of their culpability and the capacity for change. Notably, these cases underscored that juveniles tend to be less mature than adults, are more likely to possess an "underdeveloped sense of responsibility," and are more likely to engage in reckless behavior. *Roper*, 543 US at 569 (citation and quotation marks omitted). Largely for these reasons, states almost universally prohibit juveniles from making many decisions that will have long-term effects such as "voting, serving on juries, or marrying without parental consent." *Id*.

In addition, juveniles "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id*. To this end, children "have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings." *Miller*, 132 S Ct at 2464 (citations, quotation marks, and alteration omitted). And, juveniles have a lesser-defined sense of character than the typical adult, and a juvenile's "personality traits . . . are more transitory, less fixed." *Roper*, 543 US at 570. Juveniles, noted the Court in *Graham*, "are more capable of change than are adults, and their actions are less likely to be evidence of irretrievably depraved character than are the actions of adults." *Graham*, 560 US at 68 (citation and quotation marks omitted). In *Graham*, the Court explained that studies have demonstrated that "parts of the brain involved in behavior control continue to mature through late adolescence." *Id*. (citations omitted). Hence, "youth is more than a chronological fact," and "its signature qualities are all transient." *Miller*, 132 S Ct at 2467 (citations and quotation marks omitted).

For all of these reasons, the Court explained in *Roper*, 543 US at 570, that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." "[T]he distinctive attributes of youth" reasoned the Court in *Miller*, 132 S Ct at 2465, "diminish the penological justifications for imposing the harshest sentence on juvenile offenders, even when they commit terrible crimes." Thus, when it comes to sentencing a juvenile, concern must be given to the offender's youth and its attendant characteristics. This was the impetus for *Miller*'s individualized sentencing mandate. See *id*. (emphasizing that "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole."), and *id*. at 2466 ("By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—[mandatory sentencing schemes] prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender."). However, this is not to say that a juvenile should not face consequences for his or her actions; rather, in rendering punishment, consideration must be given to the fact that juvenile offenders are generally less culpable than their adult counterparts. *Graham*, 560 US at 68.

Because juveniles are different from adults and have still-evolving characters, the Supreme Court has noted how difficult it can be for a sentencer to conclude that life-without-

parole, the harshest possible penalty for a juvenile homicide offender, is proportionate to a particular offense and offender. In *Roper*, 543 US at 569, the Court recognized that "general differences" between juveniles and adults "demonstrate that juvenile offenders *cannot with reliability be classified among the worst offenders*." (Emphasis added). The *Roper* Court, citing Steinberg & Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am Psychologist 1009, 1014-1016, (2003), also remarked that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 US at 573. If this determination is difficult for even trained psychologists, we would be remiss if we did not acknowledge our concerns about sentencing courts—or reviewing courts for that matter—accurately assessing, or in essence forecasting, whether an individual who committed a crime while still a minor is and will be irreparably corrupt for the rest of his or her life, and thus, accurately meting out such a severe but proportionate sentence.

These concerns led the Court in *Miller* to caution that "given all we have said in *Roper, Graham*, and this decision about children's diminished culpability and heightened capacity for change, *we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon*." *Miller*, 132 S Ct at 2469 (emphasis added). The Court returned to the idea of the infrequency of proportionate life-without-parole sentences for juvenile offenders in *Montgomery* when it declared that "[a]lthough *Miller* did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison *is a disproportionate sentence for all but the rarest of children*, those whose crimes reflect irreparable corruption." *Montgomery*, 136 S Ct at 726 (citations and quotation marks omitted; emphasis added). In fact, the majority opinion in *Montgomery* used the words "rare" or "rarest" six times in describing when a life-without-parole sentence would be appropriate after *Miller*. See *Montgomery*, 136 S Ct at 726 (declaring life without parole to be disproportionate "for all but the rarest of children . . ."); at 733 (emphasizing that although "a sentencer might encounter the rare juvenile offender who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified[,]" a life-without-parole sentence will by and large be disproportionate); at 734 (" . . . *Miller* determined that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption") (citations and quotation marks omitted); (explaining that *Miller* declared a life-without-parole sentence to be unconstitutional "for all but the rarest of juvenile offenders"); ("[a]fter *Miller*, it will be the rare juvenile offender who can receive that same sentence"); and ( . . . *Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption.").

## B. IMPLEMENTING *MILLER* AT SENTENCING

The cautionary language employed by the Court in *Roper, Graham, Miller*, and *Montgomery* must be honored by this Court. In light of such language, and in light of our need to review defendant Hyatt's sentence under *Miller*, we conclude that, when sentencing a juvenile offender, a trial court must begin with the understanding that, in all but the rarest of circumstances, a life-without-parole sentence will be disproportionate for the juvenile offender at issue. Thus, a sentencing court must begin its analysis with the understanding that life-without-parole is, unequivocally, only appropriate in rare cases. Sentencing courts are to do more than

pay mere lip service to the demands of *Miller*. A sentencing court must operate under the understanding that life without parole is, more often than not, not just inappropriate, but a violation of the juvenile's constitutional rights. As explained in *Montgomery*:

> *Miller* then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of the distinctive attributes of youth. Even if a court considers the child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity. Because *Miller* determined that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption, it rendered life without parole an unconstitutional penalty for a class of defenders because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. [*Montgomery*, 136 S Ct at 734 (quotation marks and citations omitted).]

We note that nearly every situation in which a sentencing court is asked to weigh in on the appropriateness of a life-without-parole sentence will involve heinous and oftentimes abhorrent details. After all, the sentence can only be imposed for the worst homicide offenses. However, the fact that a vile offense occurred is not enough, by itself, to warrant imposition of a life-without parole sentence. The court must undertake a searching inquiry into the particular juvenile, as well as the particular offense, and make the admittedly difficult decision of determining whether this is the truly rare juvenile for whom life without parole is constitutionally proportionate as compared to the more common and constitutionally protected juvenile whose conduct was due to transient immaturity for the reasons addressed by our United States Supreme Court. And in making this determination in a way that implements the stern rebuke of *Miller* and *Montgomery*, the sentencing court must operate under the notion that more likely than not, life-without-parole is not proportionate.

That such an approach is required under *Miller* becomes even more apparent when one considers the warnings in *Roper*, *Graham*, and *Miller* about how difficult it is for even a trained psychologist, let alone a sentencing judge, to make any definitive determinations about a juvenile's capabilities for reform. See *Roper*, 543 US at 573 (remarking that the transient qualities of youth make determinations about a juvenile's capability for reform exceedingly difficult). In fact, the Court in *Graham*, 560 US at 77-78, felt so strongly about the difficulty of distinguishing "the few incorrigible juvenile offenders from the many that have the capacity for change" that it rejected—in the case of nonhomicide juvenile offenders—a case-specific sentencing scheme similar to the one it later adopted in *Miller*, and decided that because the determination was so difficult, it would instead impose a categorical ban in nonhomicide cases. Because MCL 769.25 permits a case-by-case determination upon the filing of the requisite motion, trial courts must operate with the understanding that, more likely than not, a life-without-parole sentence is disproportionate for the juvenile offender being sentenced. Indeed, as the Supreme Court warned in *Roper*, *Graham*, and *Miller*, given the unique and transient qualities of youth, even the most thorough, well-intentioned, and earnest sentencing courts encounter a significant risk of reaching the wrong conclusion about a juvenile's character being irreparably corrupt. And this risk carries with it the grave consequences of violating the Eighth

Amendment and of denying an undeserving individual—who it must be remembered is nevertheless deserving of significant punishment based upon the conviction—any opportunity to leave a prison he or she entered while still a child. It was not a hollow exercise for the Supreme Court in *Miller* and *Montgomery* to repeatedly emphasize how truly rare a life-without-parole sentence will be proportionate. Hence, we emphasize the caution with which a sentencing court must view the imposition of life without parole for juvenile offenders.

## C. STANDARD OF APPELLATE REVIEW

The same concerns noted above exist on appeal when a juvenile challenges the imposition of his or her life-without-parole sentence. That leads us to a second question, one raised by the prosecution and one that is inherently necessary in weighing in on defendant Hyatt's sentence in the instant case. That is, given the limited circumstances in which a life-without-parole sentence is proportionate and constitutional, what is to be the appropriate standard of review for an appellate court reviewing such a sentence?

As noted by our Supreme Court in *People v Milbourn*, 435 Mich 630, 635; 461 NW2d 1 (1990), our Legislature, in setting forth a range of appropriate punishments for criminal offenses, has entrusted sentencing courts with the responsibility of selecting the appropriate punishment from statutorily authorized sentencing ranges. These sentencing ranges embody the "principle of proportionality" because they allow a sentencing judge to tailor the sentence to the particular offense and offender at issue. *Id.* Accordingly, the *Milbourn* Court believed "that the Legislature's purpose" in enacting such a scheme was "best served by requiring judicial sentencing discretion to be exercised according to the same principle of proportionality that has guided the Legislature in its allocation of punishment over the entire spectrum of criminal behavior." *Id.* at 635-636. See also *id.* at 651 ("The Legislature then left to the judiciary, with regard to most crimes, the task of determining the sentence to be imposed upon each offender within given bounds."). The limit on the judicial discretion to be exercised in imposing penalties was that the punishment should be proportionate to the offender and the offense. *Id.* at 651-652. Hence, appellate review of the sentence imposed is for abuse of discretion, to determine whether the sentence violates the principle of proportionality, "which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id.* at 636, 654.

Turning to the instant case, we believe that the appropriate standard of review in cases where a judge imposes a sentence of life without parole on a juvenile defendant is a common three-fold standard, the likes of which are applied in a variety of contexts. Any factfinding by the trial court is to be reviewed for clear error, any questions of law are to be reviewed de novo, and the court's ultimate determination as to the sentence imposed is for an abuse of discretion. See *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (describing the standard for reviewing a sentencing court's findings of fact and conclusions of law); *Milbourn*, 435 Mich at 636, 654 (applying the abuse-of-discretion standard to sentencing review).

However, this standard, particularly the abuse-of-discretion standard, requires further explanation in this context. Because of the unique nature of the punishment of a life-without-parole sentence for juveniles and the mitigating qualities of youth, we are obligated to clarify what the abuse-of-discretion standard should look like in the context of life-without-parole

sentences for juveniles. As will be discussed in more detail below, we hold that the imposition of a juvenile life-without-parole sentence requires a heightened degree of scrutiny regarding whether a life-without-parole sentence is proportionate to a particular juvenile offender, and even under this deferential standard, an appellate court should view such a sentence as inherently suspect.

In order to provide meaningful appellate review under abuse-of-discretion standard for juvenile life-without-parole sentences, a reviewing court must remain mindful that life without parole is the maximum punishment that may be imposed for a juvenile offender under MCL 769.25. That this is the harshest penalty available under the law raises the stakes not just for the defendant, but also for appellate review of the trial court's sentencing decision. Hence, appellate review of a juvenile life-without-parole sentence cannot be a mere rubber-stamping of the penalty handed out by the sentencing court. In *Milbourn*, our Supreme Court repeatedly warned that the maximum penalty available under the law is to be imposed for only the most serious offenders and the most serious offenses or it would risk failing the proportionality test. *Milbourn*, 435 Mich at 645-646. To impose the maximum possible penalty "in the face of compelling mitigating circumstances would run against this principle [of proportionality] and against the legislative scheme." *Id*. at 653. Thus, in terms of appellate review, a reviewing court is justifiably skeptical of a sentence which represents the maximum available punishment, because such punishment is only available in limited, i.e., the most serious and extreme, circumstances. See *id*. at 654. In order to impose the maximum possible penalty, the case must "present a combination of circumstances placing the offender in [ ] the most serious . . . class with respect to the particular crime . . . ." *Id*. at 654. Accordingly, sentencing courts should guard against a routine imposition of the most severe penalty authorized by statute. *Id*. at 645. Moreover, we pay heed to *Milbourn*'s cautionary sentiment that the unjust imposition of a maximum sentence has the potential to shake "[t]he public's faith in the just and fair administration of justice . . . ." *Id*.

We use the language employed in *Milbourn* as our starting point, but point out that *Milbourn*'s sentiments ring even truer in the case of life-without-parole sentences for juveniles. Such sentences are deemed to be an "unconstitutional penalty for a class of defendants because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth." *Montgomery*, 136 S Ct at 734 (citation and quotation marks omitted). Applying the cautionary language of *Milbourn*—that the imposition of the harshest possible punishment is to be reserved and rendered with caution—in the context of *Miller* and *Montgomery*'s repeated and express warnings about how infrequently a life-without-parole sentence will be constitutionally proportionate for juveniles, we are convinced that appellate review, although done under the abuse-of-discretion standard, should consider a juvenile life-without-parole sentence as inherently suspect. While we do not suggest a presumption against the constitutionality of such a sentence, we would be remiss not to note that such sentences should require a searching inquiry into the record and the understanding that, more likely than not, the sentence imposed is disproportionate. See, generally, *Miller*, 132 US at 2466; *Milbourn*, 435 Mich at 645-646. See also Farrell, *Strict Scrutiny Under the Eighth Amendment*, 40 Fl St U L Rev 853, 856 (2013) (stating that there is "reason to be skeptical" of the idea that life without parole—a particularly harsh penalty—is proportionate for a class of offenders such as juveniles who are widely recognized as having lessened culpability). Indeed, as the Court warned in *Milbourn*, 435 Mich at 653, "[w]ith regard to the principle of proportionality, it is our judgment that the imposition of

the maximum possible sentence *in the face of compelling mitigating circumstances would run against this principle . . . .*" Time and again, our Supreme Court in *Roper, Miller, Graham*, and *Montgomery* described the numerous ways in which mitigating circumstances—which are compelling enough given the characteristics of youth to warrant a categorical bar on mandatory life-without-parole sentences—are often present in the case of juveniles on account of their youth. These mitigating circumstances—and the need for proper consideration of mitigating circumstances in an individualized sentencing scheme—were the driving force behind *Miller*'s prohibition on mandatory life-without-parole sentences for juveniles. And *Miller* and *Montgomery* repeatedly emphasized that a life-without-parole sentence will only be constitutionally proportionate for the truly rare juvenile.

Accordingly, an appellate court, in order to give effect to our Supreme Court's decision in *Milbourn* and the United States Supreme Court's direction in *Miller* and *Montgomery*, is to conduct a searching inquiry and view as inherently suspect any life-without-parole sentence imposed on a juvenile offender under MCL 769.25. See *Roper*, 543 US at 570 (announcing that the differences between juveniles and adults "render suspect any conclusion that a juvenile falls among the worst offenders."). An appellate court must give meaningful review to a juvenile life-without-parole sentence and cannot merely rubber-stamp the trial court's sentencing decision.

As a tool for undertaking this appellate review, we find it appropriate to borrow from a framework employed by some federal courts. As noted, MCL 769.25 requires weighing a variety of factors in determining whether the juvenile being sentenced is the rare juvenile offender for whom life without parole is an appropriate sentence. In determining whether the sentencing court abused its discretion in weighing the factors and arriving at its conclusion, we find instructive the following analysis found in in *United States v Haack*, 403 F3d 997, 1004 (CA 8, 2005), noting certain situations that constitute an abuse of discretion:[17]

> A discretionary sentencing ruling, similarly, may be [an abuse of discretion] if a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case.

### D. THE INSTANT CASE

Turning to the instant case, we find the trial court committed an error of law by failing to adhere to *Miller* and *Montgomery*'s directives about the rarity with which a life-without-parole

---

[17] In *People v Steanhouse*, 313 Mich App 1, 22; __ NW2d __ (2015), lv granted 499 Mich 934; 879 NW2d 252 (2016), this Court declined to apply *Haack*, given that the case concerned sentencing factors listed in 18 USC 3553(a), and sentencing courts in Michigan are not required to look at such factors. Here, by contrast, because a juvenile life-without-parole sentence requires consideration of the *Miller* factors, we find instructive *Haack*'s description of certain situations which constitute an abuse of discretion.

sentence should be imposed. When deciding to sentence defendant Hyatt to life without parole, the trial court focused on the *Miller* factors. However, the court gave no credence to *Miller*'s repeated warnings that a life-without-parole sentence should only be imposed on the rare or uncommon juvenile offender. This is inconsistent with *Miller*, and certainly inconsistent with *Montgomery*.[18] Indeed, the Court's decisions in *Miller* and *Montgomery* make clear that sentencing a juvenile to life without parole is more than a simple consideration of a set of factors. In order to give any meaning to *Miller*'s discussions about proportionality and the mitigating circumstances associated with youth, a sentencing court must pay heed to *Miller*'s discussion about how rare a proportionate life-without-parole sentence will be. In order to warrant the imposition of a life-without-parole sentence, the juvenile must be, as *Miller* unequivocally stated, the truly rare individual who is incapable of reform.[19]

Moreover, with regard to the sentencing decision in the instant case, we are concerned that the trial court, in finding life without parole was warranted in this case, emphasized the opinion of the psychologist who testified at the *Miller* hearing that defendant Hyatt's prognosis for change *in the next five years* was poor. This focus on a short, five-year period for redemption cannot be reconciled with *Miller*, which holds that a life-without-parole sentence will be proportionate for the juvenile who is irreparably corrupt and incapable of change—not one who is incapable of change within the next five years. The capacity for change within five years hardly seems of any relevance to the decision of whether an individual who committed a crime while a minor is *irreparably* corrupt, and thus, will remain corrupt and wholly incapable of rehabilitation for the remainder of his or her life expectancy, which could easily be another 60 to 80 years.

Given all that occurred at the sentencing hearing in this case, we feel compelled to remand for resentencing at which the trial court is to not only consider the *Miller* factors, but to decide whether this individual is the truly rare juvenile mentioned in *Miller* who is incorrigible and incapable of reform. Accordingly, we reverse defendant Hyatt's sentence and remand to the trial court for resentencing. On resentencing, the court is to implement the directives of *Miller* and *Montgomery* and to be mindful that those cases caution against the imposition of a life-without-parole sentence except in the rarest of circumstances. Hence, it should operate with the understanding that, more likely than not, life without parole is a disproportionate sentence for defendant Hyatt.

---

[18] We would be remiss if we did not note that the trial court lacked the benefit of *Montgomery* at the time of sentencing.

[19] As noted above, we acknowledge that, as articulated as far back as *Roper*, this determination is a difficult one to make. We also note that MCL 769.25 and *Miller* offer little in terms of guidance as to *how* to make this difficult decision. Nevertheless, the current statutory system is the one under which we are required to operate.

## V. CONCLUSION

We resolve the conflict created between the prior panel in this case and the majority in *Skinner* by concluding that a judge, not a jury, is to determine whether to sentence a juvenile to life without parole under MCL 769.25. As to the instant case, we reverse defendant Hyatt's sentence and remand for further proceedings consistent with this decision. We do not retain jurisdiction.

/s/ Jane M. Beckering
/s/ Douglas B. Shapiro
/s/ Jane E. Markey
/s/ Cynthia Diane Stephens